**UNITED STATES of America ex rel. Anthony HALL, Petitioner,**

v.

**Odie WASHINGTON, Director of the Illinois Department of Corrections, Respondent.**

No. 95–1125.

United States District Court,
C.D. Illinois,
Peoria Division.

Feb. 22, 1996.

---

Marc R. Kadish, IIT Chicago–Kent College of Law, Chicago, IL, Richard Cunningham, Chicago, IL, for petitioner.

Bradley P. Halloran, Arleen C. Anderson, Office of the Attorney General, Chicago, IL, for respondent.

## ORDER

McDADE, District Judge.

Before the Court is Petitioner Anthony Hall's Amended Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 By a Person in State Custody Under a Sentence of Capital Punishment [Doc. # 6].

## BACKGROUND

### Procedural History

On April 17, 1984, following a bench trial in the Circuit Court of McLean County, Illinois, Anthony Hall was found guilty of murder. After the court determined that he had waived his right to a jury sentencing, the court sentenced him to death. Hall filed a direct appeal to the Illinois Supreme Court which affirmed his conviction and sentence on October 17, 1986, *People v. Hall,* 114 Ill.2d 376, 102 Ill.Dec. 322, 499 N.E.2d 1335 (1986) ("Hall I"), and denied his petition for rehearing on December 1, 1986. The United States Supreme Court denied Hall's petition for writ of certiorari on March 30, 1987, *Hall v. Illinois,* 480 U.S. 951, 107 S.Ct. 1618, 94 L.Ed.2d 802 (1987), and his petition for rehearing on May 18, 1987. *Hall v. Illinois,* 481 U.S. 1060, 107 S.Ct. 2205, 95 L.Ed.2d 860 (1987).

Hall subsequently filed a state post-conviction petition in the Circuit Court of McLean County on September 28, 1987. On March 6, 1991, the trial court denied the petition. On September 23, 1994, the Illinois Supreme Court affirmed the denial of post-conviction relief. *People v. Hall,* 157 Ill.2d 324, 193 Ill.Dec. 98, 626 N.E.2d 131 (1993) ("Hall II"). The petition for rehearing was denied on January 31, 1994. On November 14, 1994, the United States Supreme Court denied Hall's petition for writ of certiorari. *Hall v. Illinois,* —— U.S. ——, 115 S.Ct. 507, 130 L.Ed.2d 415 (1994).

On March 7, 1995, the Illinois Supreme Court stayed Hall's execution pending the filing of his petition for habeas corpus in federal court. Hall filed a § 2254 Petition in this Court on March 23, 1995. By leave of this Court, an Amended § 2254 Petition was filed on July 11, 1995, which asserts the following claims:

I. MR. HALL WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS WHEN THE TRIAL COURT PRONOUNCED A DEATH SENTENCE, ERRONEOUSLY HOLDING THAT ILLINOIS LAW PRE-

VENTED IT FROM BEING MERCIFUL AND FROM FOLLOWING ITS INDIVIDUAL CHOICE TO IMPOSE A SENTENCE OF LIFE IMPRISONMENT

II. TRIAL COUNSEL WERE CONSTITUTIONALLY INEFFECTIVE AT THE CAPITAL SENTENCING HEARING WHERE THEY FAILED TO INVESTIGATE AND PRESENT ANY OF TEN SIGNIFICANT AND AVAILABLE MITIGATION WITNESSES AND WHERE THEY FAILED TO HIRE A MITIGATION EXPERT AND FAILED TO ASSIST IN THE PREPARATION OF THE PRESENTENCE REPORT

III. MR. HALL'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS WERE VIOLATED WHERE HE DID NOT KNOWINGLY AND INTELLIGENTLY WAIVE HIS RIGHT TO A SENTENCING JURY BECAUSE NEITHER THE COURT NOR COUNSEL INFORMED HIM THAT A JURY'S DECISION TO IMPOSE THE DEATH PENALTY MUST BE UNANIMOUS OR ELSE NO DEATH PENALTY MAY BE IMPOSED

IV. THE TRIAL JUDGE'S REFUSAL TO RECUSE HIMSELF AFTER HE HAD BEEN PHYSICALLY ASSAULTED BY THE DEFENDANT VIOLATED THE RIGHT TO A TRIAL AND SENTENCING HEARING BEFORE AN IMPARTIAL ADJUDICATOR AS GUARANTEED BY THE FOURTEENTH AMENDMENT AND BY THE EIGHTH AMENDMENT

V. THE TRIAL JUDGE'S REFUSAL TO ALLOW DEFENSE COUNSEL TO WITHDRAW AFTER THEY HAD A SERIES OF DISPUTES WITH MR. HALL CULMINATING IN MR. HALL'S PHYSICAL ATTACK ON COUNSEL AND AFTER COUNSEL'S ASSERTION THAT THE ATTORNEY/CLIENT RELATIONSHIP WAS "IRRETRIEVABLY LOST" VIOLATED MR. HALL'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS

VI. MR. HALL WAS DENIED A FULL AND FAIR HEARING TO ESTABLISH HIS CONSTITUTIONAL CLAIMS WHERE THE POST–CONVICTION COURT REFUSED TO ALLOW HIGHLY RELEVANT EVIDENCE AND WHERE IT REFUSED TO RECUSE ITSELF IN THE FACE OF THE APPEARANCE OF PARTIALITY

A. The Refusal To Allow An Expert In the Defense of Capital Cases To Testify and Give His Opinion That Trial Counsel Rendered Prejudicially Ineffective Assistance of Counsel

B. The Refusal To Appoint A Mitigation Expert To Establish Prejudice In Sentencing Counsel's Ineffective Performance

C. The Trial Judge's Failure To Recuse Himself From The Post–Conviction Proceedings

VII. THE ILLINOIS DEATH PENALTY STATUTE IS UNCONSTITUTIONAL ON ITS FACE AND AS APPLIED

A. The Illinois Death Penalty Statute is unconstitutional on its face because it fails to guard against discriminatory, arbitrary and capricious exercise of prosecutorial discretion in determining which defendants shall be subjected to a death penalty hearing.

B. The Illinois Death Penalty Statute is unconstitutional because it is applied in an arbitrary, capricious and discriminatory manner.

C. The Illinois Death Penalty Statute unconstitutionally vests a judicial function in the prosecution.

D. The Illinois Death Penalty Statute is unconstitutional on its face because it fails to limit the nonstatutory aggravating factors which may be considered by the sentencing authority.

E. The Illinois Death Penalty Statute is unconstitutional on its face because it fails to require written findings with regard to nonstatutory aggravating factors that would allow meaningful review and ensure that improper factors were not considered at sentencing.

F. The Illinois Death Penalty Statute is unconstitutional because it shifts to the defendant the burden of proving that a sentence other than death is appropriate or at least it is unclear who bears the burden of proof.

G. The Illinois Death Penalty Statute unconstitutionally fails to require a determination that death is the appropriate penalty.

H. The Illinois Death Penalty Statute unconstitutionally fails to provide adequate notice that the State will seek the death penalty.

I. The determination by a majority of the Illinois Supreme Court that the Death Penalty Statute is unconstitutional renders the statute and Mr. Hall's execution unconstitutional.

J. The cumulative effect of its defects renders the Illinois Death Penalty Statute unconstitutional.

### *Factual Background* [1]

■ On February 8, 1983, the body of Frieda King was found in a small closet next to a large walk-in freezer in the Pontiac Correctional Center. An autopsy revealed that King had died from severe blood loss resulting from stab wounds in the upper portion of her back and chest. At the time of the murder, Petitioner Hall had been working as a clerk in the inmate kitchen. After

an investigation, Hall was charged with the murder on February 14, 1983.

Mr. Hall's case was assigned to Judge William T. Caisley. The case remained on Judge Caisley's call throughout trial and post-conviction proceedings. On March 8, 1983, the court appointed Livingston County Public Defender David Ahlemeyer as Hall's counsel. Soon after, Hall sent a letter to Judge Caisley complaining that he was unable to establish a rapport with Ahlemeyer, apparently out of fear that the public defender's ties to the community and political concerns would weaken his ability to represent Hall. In a second letter to Judge Caisley dated June 20, 1983, Hall continued to express dissatisfaction with Ahlemeyer and asked to be represented by private counsel. Hall wrote that a "conflict of interest [between himself and Ahlemeyer is] an understatement" of the situation.

On July 11, 1983, Ahlemeyer filed a motion for a fitness hearing on the ground that "defendant refuses to cooperate with counsel and refuses to visit with him at the Pontiac Correctional Center." On August 17, 1983, the court held a hearing to consider Hall's motion to discharge Ahlemeyer and Ahlemeyer's motion to withdraw as Hall's counsel. Ahlemeyer informed the court that Hall had refused to meet with him at the Pontiac Correctional Center on June 29, 1983. Ahlemeyer further alleged that the correspondence with Hall thereafter indicated that Hall would not cooperate with him. Ahlemeyer therefore requested leave to withdraw on the ground that it was impossible to prepare an adequate defense without the cooperation of Hall. He did assure the court, however, that he had no animosity toward Hall and that there was no conflict of interest which would affect his representation.

In requesting the appointment of other counsel, Hall informed the court that he was dissatisfied because Ahlemeyer had never provided him with discovery material despite his requests and because Ahlemeyer was often not available to take Hall's phone calls or to keep Hall fully informed as to the status of

---

**1.** The Court presumes the factual findings of the state court to be correct and will only supplement them with facts from the record which are

not inconsistent with those findings. *Purkett v. Elem,* —— U.S. ——, ——, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995); 28 U.S.C. § 2254(d).

the case. Hall also claimed that he had lost confidence in Ahlemeyer's ability to vigorously contest guilt because Ahlemeyer had advised him to take a bench trial to avoid the death penalty. Finally, Hall requested counsel more experienced in capital litigation since Ahlemeyer had never been involved in a capital case before.

After hearing the State's argument in opposition to the appointment of other counsel, the court stated:

I do find that the evidence produced here before this court today, the representation of the public defender and the representation of the defendant, show that there has been inadequate preparation of this case for trial at the present time; that is in part due to the fact that the public defender had other matters which he was attending to earlier in this year and was unable to confer with Mr. Hall and that he may have been absent from his office on several occasions when Mr. Hall attempted to call him and to that extent the failure to be ready for trial may be attributable to the public defender. I do also find that Mr. Hall has refused to consult with his counsel since June and that the public defender has on [at least one occasion] been out to the penitentiary . . . and Mr. Hall has refused to consult with him relevant to his defense . . . and so I do find that a portion of the failure to be ready for trial on the defense's part rests with the defendant in failing to accept a visit from the Public Defender on one and possibly two occasions, and it is obvious to the court from what has transpired here in open court today that there does appear to be a lack of a good working relationship between the defendant and his counsel.

The court ruled that, while it "is apparent that [Hall and counsel] are not getting along well together . . . that there is some bickering going on here, [this does not] constitute cause for the appointment of counsel other than the Public Defender." The court also found that counsel's lack of experience in capital litigation did not call for the appointment of other counsel. The court reasoned that an indigent defendant is entitled only to representation by the Public Defender and not by counsel of his choice. Ahlemeyer then asked that the court disregard any *pro se* motions the defendant filed. The court thereafter granted Ahlemeyer's motion for a fitness hearing.

The fitness hearing was held on October 4, 1983. Ahlemeyer offered into evidence the report of Dr. Robert Chapman who concluded that Hall was psychologically fit to stand trial. Ahlemeyer requested to testify, and he was examined by the court. He testified that Hall continually refused to meet with Ahlemeyer or to assist Ahlemeyer on the case. As a result, Ahlemeyer was of the opinion that it was impossible to prepare an adequate defense. However, Hall testified that his refusal to cooperate with Ahlemeyer was a "deliberate and rational act" based upon Ahlemeyer's collusion with the State. He then told the court: "I am not going to cooperate with him and if he comes within an arm's length of me I will spare you the particulars. If that is what I have to do to get him off this case, I will rise to that occasion. I can only get an assault charge." Hall further stated that he would not cooperate with *any* local counsel, explaining that he had written to "private practice attorneys in the Bloomington area and they are so unethical they won't answer my letters." The court ruled that Hall was fit for trial and continued the matter until November 1, 1983.

On November 1, 1983, Ahlemeyer requested that Hall be shackled while he was in the courtroom. The court, after reading a letter addressed to the court in which Hall substantially repeated the threat made earlier, ordered Hall shackled. The court then indicated that it would entertain Hall's renewed motion for other counsel. Hall indicated he did not want to deal with Ahlemeyer or any other local counsel. He also informed the court that a private attorney, Shelly Bannister, had corresponded with him and agreed to represent him if the court would order her appointment. A letter from Bannister to the court, which was made part of the record, indicated that she had extensive background in criminal cases arising from the penitentiary, that she had discussed the case with Hall and was able to cooperate with him, and that

she was willing to accept appointment as Hall's counsel.

Ahlemeyer also renewed his motion to withdraw as counsel. Ahlemeyer argued that the physical threat Hall made in open court was a changed circumstance which required Ahlemeyer's withdrawal. He said that the threat gave "rise to a conflict between the defendant and myself that would make it very difficult for me to represent him." Ahlemeyer said that even if the defendant were rendered "absolutely immobile," the threat still "would create a conflict in my own mind." Ahlemeyer also stated: "I personally feel that his threats both in the courtroom and by letter to me were simply a part of his ... tactics of putting the court in the position not knowing what to do as far as restraining the Public Defender." Ahlemeyer said he regretted the need for the shackling. The following then occurred:

> Mr. Ahlemeyer: I personally think, your Honor, his being shackled while I prepare the case with him would not—why should I get away from you, are you threatening me again?
>
> Defendant: No, I am not threatening you.
>
> Mr. Ahlemeyer: What did you say, say it louder so the court reporter can get it on the record.
>
> Defendant: That was off the record.
>
> Mr. Ahlemeyer: He said "get away from me."
>
> Defendant: Yes, Get away from me. I am afraid of you. Keep him away from me.
>
> The Court: Please have a seat.
>
> Defendant: I am afraid of that man, keep him away from me.
>
> The Court: Mr. Hall, have a seat.
>
> Defendant: You understand?
>
> The Court: I understand.
>
> Defendant: Keep him away from me, I am afraid of him.
>
> The Court: Just please take a seat.
>
> Mr. Ahlemeyer: I would simply state your Honor, I don't think the shackling would inhibit any preparation for trial ... I would agree with Mr. Hall that being shackled in the courtroom is not the best procedure and may be something that

would have to be overcome, but unfortunately I don't think that he has left us with any choice in the matter.

The court denied the motions to replace Ahlemeyer as counsel and to appoint Shelly Bannister as Hall's counsel. The court then announced that it would meet in chambers off the record separately first with Hall and then with Ahlemeyer. After these conferences, the court indicated that it had discussed the possibility of appointing the Public Defender of McLean County to assist Ahlemeyer in the defense. While Hall initially refused this offer, on December 5, 1983, he acquiesced to the court's appointment of Steven Skelton, the Public Defender of McLean County.

The selection of the jury for Hall's trial commenced on February 21, 1984. Just prior to jury selection, the court ordered that Hall be and remain unshackled for the trial. The proceedings continued through the selection of the jury. At that point, Hall made a motion to the court saying there were certain witnesses he wanted to testify but that his counsel refused to call them. Defense counsel stated that these witnesses would harm the defense, and if they were called, Hall would have to represent himself. Hall thereby made a motion to conduct the trial *pro se.* The court urged Hall to consider the matter overnight and stayed the proceedings until the next day.

The following day, after Hall's continued insistence that he be allowed to proceed *pro se,* the court adjourned the proceedings to the conference room so that it could talk privately with defense counsel and Hall. During this conversation, the court advised Hall that it would be "foolhardy" to conduct the trial *pro se.* Hall in response asked the court if he could proceed *pro se* but have counsel sit with him, advise him, and pose objections for him. Ahlemeyer objected "strenuously" to this arrangement, calling it half-way representation and a violation of "every ethical code." The court asked Hall who the witnesses were that he wished to call, but before Hall could answer, Ahlemeyer objected because he believed it possible that a jury trial might still be waived and that Judge Caisley could then be the trier of

fact. Judge Caisley then suggested that he (Judge Caisley) leave the room and that Hall's objections be placed on the record in his absence.

There followed an interruption in the record, after which the court stated:

Let the record show that the defendant has now been removed and that the prosecution is now present in chambers and that we are outside the presence of the jury and the persons assembled in the courtroom, and let the record further show that defense counsel, Steven Skelton has just been struck on the head with a chair and that the court has also been struck by defendant on the head with his fist and at this point, bearing in mind the previous threats that were made by the defendant at the pretrial stage against defense counsel, the court is going to order from this stage on the defendant shall be shackled at all times whether in the presence of the jury or not because it is essential for the security of the court and the officers of the court. This decision has been made only with most reluctance, but I think that with this overt act and the fact that one defense counsel and the court itself has been attacked by this defendant indicates the necessity of this step which is most reluctantly taken.

Ahlemeyer and Skelton subsequently testified that, not only had Hall struck Skelton over the head with a chair, but he had also thrown a chair at Ahlemeyer before punching Judge Caisley. Skelton's injuries included "a pretty good lump and a welt, a concussion." His jacket was ripped down the back. Skelton had headaches continuously for two weeks thereafter, causing him to consult his physician. Ahlemeyer slightly injured his leg as he tripped over the court reporter's machine on the way out the door. Ahlemeyer and Skelton testified that Judge Caisley was the "most severely hurt" of the three. Medical personnel at the courthouse told him to lie down, and he did so for about a half hour. He had abrasions and contusions on his head. Judge Caisley disagreed with defense counsel's assessment as follows: "I was struck in the head, and I did suffer a contu-

sion, swollen slightly in the head, and I was not significantly injured."

After the attack, Hall was removed from the conference room by several correctional officers and was ordered to be shackled by the court. After this was done, Hall was brought back into the court outside the presence of the jury. The court then asked Hall if he still wished to proceed without counsel. When Hall did not respond, the court assumed that his silence constituted a withdrawal of his motion.

Defense counsel then made another motion to withdraw from the case, stating that they could not "ethically or morally" proceed on Hall's behalf and that any attorney-client relationship which had previously existed was now "irretrievably lost." They also pointed out that the occasion may arise when they might be called to testify against Hall in a separate proceeding arising from the battery. However, the court denied the motion saying that "under the circumstances, just minutes before the trial is to begin I don't think at this point I can in all fairness allow defense counsel to withdraw."

Defense counsel also asked the court to reconsider its decision that Hall's silence constituted a withdrawal of his motion to proceed *pro se*. Counsel pointed out that the last thing Hall had said was that he still wanted to represent himself and that the matter had never been adequately resolved. The court responded that Hall had never unequivocally stated that he did not want counsel and thus he had never knowingly waived his right to counsel.

Defense counsel next made a motion for a mistrial, arguing that the occurrence in the conference room had tainted the jury. The court denied the motion for a mistrial saying that a defendant could not, by his own misconduct, bring about a mistrial. Moreover, the court found that the conflict between Hall and his counsel afforded no grounds for mistrial, nor did the possibility that the jury might have heard the scuffle in chambers.

Defense counsel further asked the court to recuse itself, arguing that it would be impossible for the court to be fair after being struck on the head by Hall. The court de-

nied the motion for recusal, saying that the interests of "proceeding to justice ... requires a certain element of courage to go forward" and that it would not allow the fact that Hall had struck the court to prejudice or influence it.

The court allowed Hall back into the courtroom, but required that he sit away from his counsel, with several guards seated behind him, and with his hands and feet cuffed. Hall made another motion to waive his right to counsel and proceed *pro se*. The court questioned Hall and found that there was no knowing and intelligent waiver. Hall told the court, "I still don't understand a word you said," and accused Skelton of hitting him. The motion was denied.

During the prosecution's opening statement to the jury, Hall interrupted to inform the court that he wanted to waive his right to a jury trial. After the prosecution concluded its opening statement and defense counsel reserved an opening statement, the jury was excused and counsel repeated Hall's request to waive a trial by jury. The court admonished Hall as to the charges against him, and that the court would determine his guilt or innocence and the range of possible sentences if judgment were entered against him. Hall said that he understood, and the court accepted his jury waiver for the guilt phase of the trial.

At that point, there arose a question as to whether Hall was also waiving his right to a jury sentencing. Hall told the court, "I don't want a jury, period, in any phase of this trial." He explained:

[A]ssuming that we get to the penalty phase, and according to the conduct that happened today by you being hit in the mouth and the attorney being jumped on and the attorney be fighting with me, I feel that you would transfer, and correct if I am wrong, transfer the penalty disposition to another Court to decide, that way it would clear yourself of undue prejudice or bias due to the fact that you were hit in the mouth today and this is what I see may come down the line, assuming that I am found guilty. That is why I want to have that right exercised today to waive jury on

the guilt and innocence phase and penalty, if possible, if we get to that stage.

However, Defense counsel, the State, and the court all agreed that the issue had not yet arisen and therefore the court postponed any decision as to whether Hall was also waiving jury sentencing.

The court informed the members of the jury that Hall had decided to waive trial by jury. The court therefore excused the jury but admonished the jurors to avoid speaking to anyone or listening to radio or television broadcasts concerning the case because there was "the possibility that you may be required to determine the matter of punishment." After the jury was excused, Hall was tried by the court which found Hall guilty of murder on March 2, 1984.

After the guilty verdict, the State reminded the court that it was seeking capital punishment and therefore asked that Hall make a choice whether to call back the original jury, pick another jury, or proceed with a court sentencing. Defense counsel requested a date for sentencing and said it would make a decision prior to that. The court, however, said it needed a decision that afternoon because it had "14 jurors who have been qualified." The court was referring to the jurors who had been dismissed following the State's opening argument. The court recessed the proceedings until afternoon and again asked Hall to decide whether he wanted a court or jury sentencing. After a brief forty second recess in which Hall discussed the matter with his counsel, Hall told the court he would waive jury sentencing.

The court admonished Hall that if he waived jury sentencing, the court would be the sole determiner of the sentence. However, the court did not explain to Hall that under Illinois law, a jury's decision to impose the death penalty must be unanimous. The court accepted Hall's waiver, and the jury was discharged.

Later that same day, Hall spoke to Charles Schiedel, Deputy Defender of the Supreme Court Unit of the State Appellate Defender's Office, who asked Hall if he had been advised of the unanimity requirement for imposing a jury verdict. When he learned that Hall had not, Schiedel explained

the requirement to Hall and advised him to tell his attorneys and the court of the unintelligent nature of his jury waiver. On April 17, 1984, the day the sentencing hearing was to begin, Hall made a motion to withdraw his jury sentencing waiver on the basis that he had not been informed, either by the court or by counsel, that a jury's decision to impose the death penalty must be unanimous. The court denied Hall's motion to withdraw his jury waiver, saying that Hall had knowingly waived his right to a jury sentencing and that a qualified jury had already been discharged.

The State proceeded with aggravation witnesses, first calling the warden of Pontiac prison, who testified that the deceased was killed while working in the prison. The State next introduced the testimony of Ron Umbdenstock, a correctional captain at Menard Correctional Center. He testified that Hall was involved in an altercation while an inmate at Menard. Hall had allegedly held an inmate while two other inmates stabbed him; however, the victim was only slightly injured. Umbdenstock also testified that Hall and his accomplices had tried to throw a man off the prison galley. Hall had ten months of statutory "good time" revoked because of this incident. On cross-examination, the witness admitted that the report written on the incident only charged Hall with being involved in a fist fight.

The State introduced convictions for armed robbery, armed violence, and rape. The State also introduced the testimony of two of Hall's past victims. One testified that she had been robbed and raped by Hall, and the other testified that Hall had robbed and attempted to rape her. The State offered no evidence concerning the assault on defense counsel and the trial judge.

The defense introduced the testimony of Lloyd Shaddle, a dentist and Jehovah's Witnesses minister who had conducted religious services for Hall while he was incarcerated. He testified that Hall regularly attended bible study classes and often expressed concern for his family.

Hall took the stand next. He testified that his mother had been 13 years old when he was born. He testified that he had first been incarcerated at the age of 16 and had been out of prison for only two years of his entire adult life. He also testified that he was married, a high school graduate, and a member of the Jehovah's Witnesses. The final witness was Dr. Syed Ali, a psychiatrist at Pontiac Correctional Center. He conducted an examination of Hall from which he determined that Hall was of above-average intelligence and was anxious and depressed about the forthcoming sentence.

The court also considered a presentence report prepared by Probation Officer Ramona Beasley. The report consisted of a recitation of Hall's prior convictions and his institutional disciplinary record. The report indicated that the probation officer had sent a letter to Hall's wife, Clereatha Hall, but that she had not responded. The report also stated that the probation officer had attempted to interview Hall in prison on two occasions, but he had refused to speak to her.

In his final argument before sentencing, Ahlemeyer argued to the court that the death penalty is wrong in every case. He further contended that "[t]he mitigating factors in this case involve Hall's childhood development, lack of normal guidance and advantages that many of us have, his present abilities, his religious beliefs." Ahlemeyer then concluded by asking the court "to spare Hall's life today for all of our benefits, to demonstrate that we are not on the level of the perpetrators of vicious crimes; that we are capable of rising above that and dealing with people in a human way and in a Christian way ... when a tragedy like this happens, all of us bear some of the guilt."

In sentencing Hall to death, Judge Caisley set forth the various statutory factors that he had considered in making his decision. During this discussion, he added:

> I haven't seen that spark of interest in rehabilitation, that desire on the part of the defendant to change. Doctor Shaddle was in here this morning and spoke about teaching Bible class in which the defendant was enrolled and this might have set off an indication within the defendant that he was going to become rehabilitated. However,

this offense occurred after [Hall's attendance in Bible class] and so I am not persuaded that there is likely to be rehabilitation in this case.

The court concluded:

The choice in this case really boils down to two choices and both of them certainly have a cry to be heard and considered by this court. It is a choice between justice and a choice between mercy. If the choice were mine to make individually I would make a choice on the side of being merciful in sentencing this Defendant to a term of life imprisonment. However—and I do feel just because Anthony Hall did not show mercy toward Frieda King and did not show mercy toward any of the other unfortunate victims, two of whom were here today, is not a good reason to deny him mercy. But I have also taken an oath to administer the laws of the State of Illinois in a manner that I best can, and it seems to me that it is my duty under the laws of the State of Illinois in following my oath of office as judge to sentence the Defendant, Anthony Hall, to death. And so it is with a good deal of personal reluctance on my part, although not with any doubt that he is guilty of this offense or that there are any mitigating factors under the statute that would prevent it or that there are any aggravating factors that would prevent it. I think all of the aggravating factors are stacked against the Defendant. I think there has been a complete absence of mitigating factors. I am persuaded there is not reasonable doubt here, and so it is my unhappy duty under the laws of the State of Illinois to sentence Anthony Hall to death ...

After Hall's direct appeal was affirmed by the Illinois Supreme Court, he filed a *pro se* post-conviction petition alleging that he had been denied his right to the effective assistance of counsel at sentencing and that he had not made a knowing and intelligent waiver of the sentencing jury. Judge Caisley initially appointed the Public Defender of Logan County as Hall's post-conviction counsel, but when Hall requested that Professor Marc R. Kadish of Chicago be appointed, the judge granted the request. Kadish moved for Judge Caisley's recusal based upon the assault, but the motion was denied. The defense also filed a motion for the appointment of a mitigation expert to help establish sentencing counsel's ineffectiveness. The court denied the motion.

The court did, however, grant an evidentiary hearing on the ineffective assistance of counsel issue. The defense filed a motion *in limine* to be allowed to call Michael Metnick as a legal expert to testify as to the prevailing standard for counsel competency in capital cases and to render his opinion that sentencing counsel in this case failed to meet that standard. The court found that Metnick was qualified as an expert, but refused to allow him to testify on the ground that his testimony would not be helpful because he would be second-guessing trial tactics of original counsel.

At the evidentiary hearing, the defense presented testimony and affidavits of ten mitigation witnesses who were never contacted by defense counsel or asked to testify at the sentencing hearing. These witnesses were: Father Richard Means, a chaplain at Pontiac Correctional Center; Leta Powell, whom Hall had saved from drowning; Thomas R. O'Connor, who had worked with Hall at Pontiac; Paula Robinson, whom Hall had assisted by chasing away an attacker; Patricia Rolfe Hunt, whose child Hall had saved from choking; Fate Mickel, Hall's old basketball coach; Julian Smith, a janitor at Hall's elementary school; and Hall's mother, sister, and wife.[2]

Hall testified on his own behalf about his attempts to have Ahlemeyer removed as his counsel and to have Shelly Bannister, with whom he had developed a good relationship, appointed. He stated that he had lost 360 days good time credit for his altercation with counsel and the trial judge. Hall also testified that after he was found guilty on March 2, 1984, neither of his attorneys ever came to visit him or to discuss the importance of

---

**2.** Father Richard Means and Leta Powell testified in person at the hearing. By stipulation of the parties and agreement of the court, the testimony of the other eight witnesses was introduced through their affidavits only.

preparing for the sentencing hearing before that hearing occurred on April 17, 1984. Neither of them informed him that a probation officer would visit him to prepare a presentence investigation report. When the probation officer attempted to see him at the prison, he refused the visit because he did not know the purpose of the visit. He therefore had no input into the content of the presentence investigation. Hall stated that prior to trial, he gave his attorneys a list of witnesses he wanted called which included the individuals whose affidavits the defense produced at this post-conviction hearing.

The State called Ahlemeyer and Skelton as its witnesses at the post-conviction hearing. Ahlemeyer testified that after the altercation with Hall, there "wasn't much" of an attorney-client relationship "at all from that point on." Ahlemeyer stated that, "frankly, I don't remember exactly talking to" Hall after the guilty verdict but prior to sentencing. However, he said that he must have gotten Dr. Shaddle's name from Hall at some point. Prior to trial, Ahlemeyer had tried to get Hall's mother and wife to attend the trial, but he was unsuccessful. He also had given one of them the sentencing date and told them "if they wished to appear that they were certainly welcome." Ahlemeyer said he knew Father Means by sight, but he had no recollection of talking to him, and he did not know if Means had ever called his office, but there would have been no reason to refuse to call him as a witness. Ahlemeyer testified that he was aware of what a mitigation expert is and that he was aware of their use at the time of the sentencing hearing although "they weren't so popular then." Ahlemeyer said he did not seek the service of a mitigation expert because, "I guess it is just because it wasn't being done … it was the type of thing that was just getting started, and I guess that's the reason."

On cross-examination, Ahlemeyer said that he had only moved to withdraw from 5 or 6 cases in 15 years of practice and that he only did so when "I am unable to assure them that I will act in their best interests." Ahlemeyer said he never discussed with Skelton who was the lead counsel on the case, and he did not recall their dividing responsibilities.

After the attack by Hall, Ahlemeyer made a report of the incident to the County Sheriff's Department. He was unaware whether the Department of Corrections ever took disciplinary action against Hall as a result of the incident.

Ahlemeyer said his strategy in preparing for sentencing was "to focus in on an argument based on just generally on the theory opposing the death penalty in all cases." This approach was taken because Ahlemeyer believed that the evidence in aggravation was overwhelming and that it was not "going to do a lot of good to Hall to try to prove that when he was thirteen years old he·was a good boy." Ahlemeyer thought it was better to attack the death penalty because he knew Judge Caisley to be a very religious and sympathetic man. It was Ahlemeyer's judgment before sentencing "that mitigation was pretty scarce." Ahlemeyer did not remember ever attempting to contact Hall when he became aware that Hall was refusing to see the probation officer.

Skelton testified that his agreement on the division of labor with Ahlemeyer was that Ahlemeyer would handle the sentencing phase of the case by himself. Skelton said he never spoke to Hall after the guilty verdict until the day of sentencing and failed to inform Hall about the function of the probation officer. There had been some discussion with Hall about who he wanted to call at sentencing, but Ahlemeyer made the final decision. Skelton had no recollection of Father Means or Leta Mills or Hall's mother and wife ever trying to contact him to testify, but there was no reason Skelton was aware of as to why they would not have been called to testify if they had indicated a desire to do so.

On cross-examination, Skelton said that he was brought into the case because Ahlemeyer and Hall were not getting along, "to put it mildly." After entering the case, Skelton provided Hall with the discovery materials, something Ahlemeyer had not done. After he was hit by Hall, Skelton was questioned by the Sheriff's Department and photos were taken of his and the Judge's injuries. Skelton was not aware that Hall lost good time credits as a result of the incident. Skelton

moved to withdraw at that time because he believed the attorney-client relationship was irretrievably lost. Skelton said that it was "certainly" difficult for him to fulfill his obligations to his client. Skelton had a vague recollection of meeting with Father Means after sentencing and Means' inquiry as to why he had not been called to testify. He did not think he ever spoke to Hall about the nature of the presentence report. Skelton also testified that he would have called Hall's mother and his wife at sentencing if they had "been made available."

At the conclusion of the evidentiary hearing, the court made the following finding:

What the evidence does establish is that the defense, for one reason or another, may have failed to call witnesses who would have testified as to Anthony Hall's good character, as to good deeds that he had done previously, and . . . that there are witnesses out there who were available and who might have been called by defense counsel to testify at the sentencing hearing as to other mitigating evidence . . .

The court ordered the parties to submit additional briefs on the question of "whether or not that incompetence of counsel is sufficient to grant [ ] relief."

After briefs were submitted, the court entered a written order on March 6, 1991, denying the post-conviction petition. The written findings included that the failure to call Hall's wife and his mother was excusable because "[t]heir indifference during the trial [as shown by their failure to be present] could certainly have been read to be a sign of hostility toward the defendant or of fear of him." The court found the failure to call Father Means not to be prejudicial because a clergyman of Hall's Jehovah's Witnesses faith, Lloyd Shaddle, had been called to testify at sentencing. The court concluded:

Without exception, the affiants would have testified about Hall's character, and personality. . . . Certainly the court was interested in learning as much about Mr. Hall's character as possible. However, some of the affiants' testimony would have merely supported the court's own observations concerning Anthony Hall's character commencing with an initial conference with

him on February 23, 1983, and continuing through the conclusion of the sentence hearing a little more than a year later. The court was exposed to Hall's friendliness and sociability. At times he could be very respectful and pleasant to be near. He seemed genuinely interested in court personnel and frequently conversed easily with them at recesses.

Thus, the court found that even if the witnesses had been called at sentencing, there would not be a reasonable probability that the sentence would have been different. The Illinois Supreme Court affirmed the denial of post-conviction relief.

## ANALYSIS

### I. Right to an Individualized Sentencing Decision

Petitioner claims that his constitutional rights under the Eighth and Fourteenth Amendments were violated when the trial judge was prevented, through his own erroneous understanding of the law, from imposing an individualized sentence upon him. In imposing Hall's death sentence, Judge Caisley stated:

The choice in this case really boils down to two choices and both of them certainly have a cry to be heard and considered by this court. It is a choice between justice and a choice between mercy. If the choice were mine to make individually I would make a choice on the side of being merciful in sentencing this Defendant to a term of life imprisonment. . . . But I have also taken an oath to administer the laws of the State of Illinois in a manner that I best can, and it seems to me that it is my duty under the laws of the State of Illinois in following my oath of office as judge to sentence the Defendant, Anthony Hall, to death. . . . I think all of the aggravating factors are stacked against the Defendant. I think there has been a complete absence of mitigating factors. I am persuaded there is not reasonable doubt here, and so it is my unhappy duty under the laws of the State of Illinois to sentence Anthony Hall to death.

Petitioner asserts that this language demonstrates the trial judge's erroneous belief that mercy could not be used as a mitigating factor in imposing Hall's sentence when in fact Illinois law does allow for such a factor to be considered. *See Hall I,* 102 Ill.Dec. at 338, 499 N.E.2d at 1351 *citing People v. Holman,* 103 Ill.2d 133, 170, 82 Ill.Dec. 585, 469 N.E.2d 119 (1984), *cert. denied,* 469 U.S. 1220, 105 S.Ct. 1204, 84 L.Ed.2d 347 (1985) ("[M]ercy is a relevant factor for consideration at a capital sentencing hearing, but it is to be considered within the context of all factors in aggravation and mitigation."). However, the Court finds that Judge Caisley properly applied the law at Hall's sentencing.

■ The purpose of individualized sentencing in the death penalty context is to ensure that the "sentencer has treated the defendant as a 'uniquely individual human being' and has made a reliable determination that death is the appropriate sentence. Thus, the sentence imposed at the penalty stage should reflect a reasoned moral response to the defendant's background, character, and crime." *Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989) (internal citation omitted). This underlying purpose is not served when a sentencing judge or juror invariably decides to impose the death penalty upon everyone who becomes eligible for it. *See Morgan v. Illinois,* 504 U.S. 719, 728, 112 S.Ct. 2222, 2229, 119 L.Ed.2d 492 (1992) (internal citation omitted):

> Surely if in a particular Illinois case the judge, who imposes sentence should the defendant waive his right to jury sentencing under the statute, was to announce that, to him or her, mitigating evidence is beside the point and that he or she intends to impose the death penalty without regard to the nature and extent of mitigating evidence if the defendant is found guilty of a capital offense, that judge is refusing in advance to follow the statutory direction to consider that evidence and should disqualify himself or herself. Any juror to whom mitigating factors are likewise irrelevant should be disqualified for cause, for that juror has formed an opinion concerning the

merits of the case without basis in the evidence developed at trial.

■ Likewise, the purpose behind individualized sentencing is equally not served when the sentencing authority invariably decides *not* to impose the death penalty out of a purely personal sense of mercy, regardless of the presence of aggravating factors. For instance, a juror may be excluded "for cause" where he has made unmistakably clear that he "would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before [him]." *Witherspoon v. Illinois,* 391 U.S. 510, 522 n. 21, 88 S.Ct. 1770, 1777 n. 21, 20 L.Ed.2d 776 (1968) (emphasis in original). Because the death penalty is designed to be imposed according to the individual circumstances of the offense and characteristics of the offender, *see Penry,* 492 U.S. at 319, 109 S.Ct. at 2947; *Gregg v. Georgia,* 428 U.S. 153, 187, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976), it would be against the current dictates of Supreme Court precedent for a trial judge to disregard the relevant aggravating and mitigating factors at issue in a particular case. *See California v. Brown,* 479 U.S. 538, 542–43, 107 S.Ct. 837, 840, 93 L.Ed.2d 934 (1987) (holding that the decision to impose the death penalty should not be based on "extraneous emotional factors" such as "mere sympathy" that are unrelated to the particular aggravating and mitigating factors at issue in the case).

■ While this discussion may appear to digress from the issue at hand, it actually resolves it by explaining the language used by Hall's sentencing judge. Prior to the instant case, Judge Caisley had never sentenced anyone to death. Moreover, Judge Caisley had a reputation as being a very religious and sympathetic man. In fact, this is why Ahlemeyer's strategy at the sentencing hearing was to attack the death penalty in *all* cases rather than focusing on the aggravating and mitigating factors particular to Hall. In his decision, Judge Caisley initially stated, "If the choice were mine to make individually, I would make a choice on the side of being merciful in sentencing this defendant to a term of life imprisonment." In

other words, if no statutory scheme existed to guide his decision, his personal sense of mercy would compel him to not impose the death penalty in any case.

However, realizing that such a ruling based upon mercy alone would offend the notion of individualized sentencing as well as Illinois law, Judge Caisley rightly chose instead to focus on the presence of aggravating and mitigating factors particular to Hall's case. Under this analysis, the court found that "all of the aggravating factors are stacked against the defendant," thus making him eligible for the death penalty under the statute. 720 ILCS 5/9–1(b). The court was then required to find at least one mitigating factor *"sufficient to preclude"* the imposition of the death penalty. 720 ILCS 5/9–1(h) (emphasis added).

■ It is at this point that Petitioner believes that Judge Caisley made a mistake of law and erroneously found that mercy could not be such a mitigating factor. However, a trial judge is presumed to know the law and to apply it in making his decisions. *Walton v. Arizona,* 497 U.S. 639, 653, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990). Nowhere in the record does Judge Caisley demonstrate an ignorance of the law. Rather, his failure to assert mercy as a mitigating factor sufficient to preclude the death penalty was a calculated decision on his part. The statute requires the sentencing authority to weigh the various aggravating and mitigating factors in order to decide whether any mitigating factor is "sufficient to preclude" the imposition of the death penalty. *Silagy v. Peters,* 905 F.2d 986, 998 (7th Cir.1990), *cert. denied,* 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991). In other words, the fact that the trial court feels some mercy for a defendant does not mean that mercy automatically constitutes a mitigating factor "sufficient to preclude" the death penalty; this determination must be

made within the context of the aggravating factors also.

Thus, when Judge Caisley said, "I think there has been a complete absence of mitigating factors," he meant that there had been a complete absence of *significant* mitigating factors that would outweigh the aggravating factors stacked against Hall and be *sufficient to preclude* the imposition of the death penalty. This was a reasonable disposition of the case. By making this finding, Judge Caisley properly placed the relative mercy required by the statutory language and the United States Constitution above his personal sense of mercy unrelated to the particular circumstances of Hall's case. In this way, Judge Caisley's decision to impose the death penalty was more "individualized" in the constitutional sense than Petitioner's version would have him be.[3]

Because the language used by Judge Caisley at sentencing can be reasonably interpreted in accordance with the Illinois Death Penalty Statute, Petitioner has failed to rebut the presumption that the trial judge correctly applied the law to the facts of the case. *See Walton,* 497 U.S. at 653, 110 S.Ct. at 3057. Accepting the factual findings of the Illinois Supreme Court as true, *Purkett,* —— U.S. at ——, 115 S.Ct. at 1771; 28 U.S.C. § 2254(d), the Court finds that Judge Caisley properly applied the laws of Illinois when he sentenced Hall to death. Thus, Petitioner's claim is denied.[4]

## II. Ineffective Assistance of Counsel

Petitioner contends that his trial counsel, Ahlemeyer and Skelton, were constitutionally ineffective at the capital sentencing hearing because of their failure to: (1) present any of ten available mitigation witnesses; (2) hire a mitigation expert; and (3) assist in the preparation of the presentence report.

3. Petitioner questions why Judge Caisley would "waste judicial time saying that his choice boiled down to one between justice and mercy if he believed the choice was a fiction?" The answer is that such a statement was rhetorical and in fact depicted Judge Caisley's belief that his personal sense of mercy could not be used as a mitigating factor.

4. Because the Court believes that Judge Caisley's statements at sentencing are unambiguous as to his understanding of the law, no evidentiary hearing is necessary on this issue.

■ To make out a claim of ineffective assistance of counsel under the Sixth Amendment, Petitioner must demonstrate that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) a reasonable probability exists that, but for his attorney's unprofessional representation, the result of the proceedings would have been different. *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984). Failure to satisfy either of these prongs is fatal to such a claim. *United States v. Slaughter,* 900 F.2d 1119, 1124 (7th Cir.1990). If a claim of ineffective assistance of counsel can be disposed of using the prejudice prong alone, that course should be followed. *Smith v. Lane,* 794 F.2d 287, 290 (7th Cir.1986); *Strickland,* 466 U.S. at 700, 104 S.Ct. at 2071.

■ The Court believes that *Strickland* itself is dispositive of Hall's first ground of ineffectiveness. In *Strickland,* the petitioner argued that his counsel had been constitutionally ineffective at the capital sentencing phase because his counsel had failed to present character witnesses on his behalf. 466 U.S. at 699, 104 S.Ct. at 2070. The Supreme Court in *Strickland* held that the petitioner had not met the "prejudice" prong of its test for attorney ineffectiveness:

> [A]t most this evidence shows that numerous people who knew respondent thought he was generally a good person and that a psychiatrist and psychologist believed he was under considerable emotional stress that did not rise to the level of extreme disturbance. Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed.

*Id.* at 700, 104 S.Ct. at 2071.

Likewise, in the instant case, Petitioner alleges that his counsel's failure to present ten mitigation witnesses at his capital sentencing hearing deprived him of his Sixth Amendment right to counsel. However, just as in *Strickland,* each of these witnesses is merely vouching for Hall's good character. Three witnesses (Powell, Hunt, and Robin-son) would have provided examples of Hall's heroism in saving them or their children from incidents of drowning, choking, assault, and flat tires. Father Means would have testified that he "saw no evidence of violence in Mr. Hall and that Mr. Hall was honest, sensitive, sociable, respectful, a good worker and pleasant to be around." O'Connor would have testified that Hall was "loyal, cooperative, reliable, nice, caring, concerned, patient, and trustworthy." Mickel would have stated that Hall was a "pleasant, hardworking student." Smith would have called Hall a "friendly, pleasant, fine young man." Hall's sister and wife would have made similar remarks about Hall's character. Hall's mother would have testified that she was only 13 years old when Hall was born and that he never knew his father.

However, these general allegations of Hall's good character and childhood deprivations hardly rebut the laundry list of aggravating evidence stacked against him. To begin with, Hall is a convicted murderer. He carried a knife to the cold storage area of the prison with the intent to murder Frieda King in cold blood. The number of wounds inflicted upon her body was evidence that she suffered a brutal death. Hall committed this murder despite his regular attendance at bible study classes in prison. He used his assignment in the inmate kitchen to commit the murder. He killed King while she was working in the course of her duties at the prison.

In addition, Hall had a considerable criminal history. He had allegedly held an inmate while two other inmates stabbed the victim. He had attempted to throw a man off the prison galley (although the prison report noted it as a fist fight). He had prior convictions for armed violence, armed robbery, and rape. One of his victims testified that he had robbed and raped her; another testified that he had robbed and attempted to rape her. He had been in prison since the age of sixteen (with the exception of two years). The court reasonably found that he had no good chance for rehabilitation. Like the Supreme Court in *Strickland, id.,* this Court finds that the overwhelming nature of the aggravating evidence negates any reasonable

probability that but for the exclusion of the ten mitigating witnesses, the result of the proceedings would have been different. *Id.* at 699, 104 S.Ct. at 2070.

Another factor that influences the Court's decision in this regard is the fact that Judge Caisley *did* hear these ten mitigation witnesses at Hall's post-conviction hearing and found:

> Without exception, the affiants would have testified about Hall's character, and personality.... Certainly the court was interested in learning as much about Mr. Hall's character as possible. However, some of the affiants' testimony would have merely supported the court's own observations concerning Anthony Hall's character commencing with an initial conference with him on February 23, 1983, and continuing through the conclusion of the sentence hearing a little more than a year later. The court was exposed to Hall's friendliness and sociability. At times he could be very respectful and pleasant to be near. He seemed genuinely interested in court personnel and frequently conversed easily with them at recesses.

On this basis, the trial court denied Hall's claim for post-conviction relief.

In light of the record, the Court believes that Judge Caisley's decision was sound.[5] Who better to know whether the outcome would have been different than the same judge who had originally sentenced Hall to death?[6] *See also Stewart v. Gramley,* 74 F.3d 132, at 135 (7th Cir.1996) ("[S]ince it is

obviously not the theory of capital punishment that murderers are compelled to murder by their past and therefore should not be punished, it cannot be right that anything brought out at a death-penalty hearing is certain or even likely to help the defendant to save his life.").

■ The same can be said for Hall's second ground for asserting ineffective assistance of counsel at the sentencing phase—the failure to call a mitigation expert. At the conclusion of the evidence at the post-conviction hearing regarding the need for a mitigation expert, Judge Caisley found that the testimony of such a expert would not have reasonably resulted in a different outcome. This was a reasonable finding in light of the aggravating evidence against Petitioner and the fact that mitigation experts were rarely used at the time of Hall's trial. Thus, that ground also does not meet the prejudice prong of *Strickland.*

■ As for the third ground, counsel's failure to participate in the preparation of the presentence report, it has been procedurally defaulted by Petitioner's failure to raise that issue in the post-conviction petition or on appeal to the Illinois Supreme Court from his sentence of death. *See Jones v. Washington,* 15 F.3d 671, 675 (7th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 2753, 129 L.Ed.2d 870 (1994) (holding that procedural default occurs where Petitioner does not raise the issue to the state's highest court on post-conviction review);[7] *Reese v. Peters,*

---

5. At the sentencing hearing, Judge Caisley heard the testimony of Lloyd Shaddle, a minister of Hall's faith, who testified that Hall regularly attended bible study classes and often expressed concern for his family. Thus, the testimony of Father Means would have been merely cumulative. Petitioner contends that Father Means' testimony would have been significant because "at the time of sentencing, Judge Caisley stated he would have found mitigating evidence of a desire for rehabilitation had Hall's studies with Shaddle continued after the murder." On the contrary, Judge Caisley merely stated that the fact that Hall committed the murder after attending Shaddle's bible study classes showed his lack of rehabilitation. It is highly illogical to think that Hall's continuing his bible study classes after the murder would have changed the court's mind on this matter.

6. Of course, this should not be the result in every case in which the trial judge examines his previous decision with the benefit of hindsight. However, in this case, Judge Caisley's decision at the post-conviction hearing is amply supported by the record evidence. Thus, it merely sheds more light on the reasonable probability of whether the new evidence would have changed the result of the original proceeding.

7. In *Hogan v. McBride,* 74 F.3d 144, at 147 (7th Cir.1996), the Seventh Circuit held that in order to constitute a procedural default, the failure to raise a claim to the state's highest court on discretionary review must be made "on pain of forfeiture" under state law. However, *Hogan* is inapplicable to the instant case where review by the Illinois Supreme Court is a matter of right. *See* IL Const. Art. 6, § 4(b) ("Appeals from judgments of Circuit Courts imposing a sentence of

926 F.2d 668, 671 (7th Cir.1991) (holding that procedural default occurs where Petitioner fails to raise the issue on direct appeal or fails to raise the substantial denial of a constitutional right in the original or amended post-conviction petition). Nor has Petitioner established "cause and prejudice" for the default, *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991), or shown that he is "actually innocent" of the death penalty. *Schlup v. Delo,* —— U.S. ——, ——, 115 S.Ct. 851, 862 (1995). Thus, the Court need not even consider that claim in this collateral proceeding. However, the Court notes that the overwhelming aggravating evidence against Hall would negate any reasonable probability of the result being different by counsel's involvement with the presentence report. Thus, the prejudice requirement of *Strickland* would not be met.

Petitioner cites a number of cases where counsel failed to present mitigating evidence at a death penalty sentencing hearing and the court found that the prejudice requirement of *Strickland* had been met. However, all of these cases are distinguishable. In the instant case, counsel did not fail to present mitigating evidence of diminished mental capacity or psychiatric problems, *cf. Brewer v. Aiken,* 935 F.2d 850, 857–59 (7th Cir.1991); *Wilson v. Butler,* 813 F.2d 664, 671–73 (5th Cir.1987), *on reh'g,* 825 F.2d 879, *cert. denied,* 484 U.S. 1079, 108 S.Ct. 1059, 98 L.Ed.2d 1021 (1988); *Hendricks v. Calderon,* 1995 WL 517211, at \* 10 (9th Cir. Sept. 1, 1995), or of the absence of prior felony convictions. *Cf. Lewis v. Lane,* 832 F.2d 1446, 1457 (7th Cir.1987), *cert. denied,* 488 U.S. 829, 109 S.Ct. 83, 102 L.Ed.2d 59 (1988); *Woodard v. Sargent,* 806 F.2d 153, 157–58 (8th Cir.1986). Nor was Petitioner's counsel suffering from personal problems which prevented him from putting on an effective defense. *Cf. Dillon v. Duckworth,* 751 F.2d 895, 897, 901 (7th Cir.1984), *cert. denied,* 471 U.S. 1108, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985) (counsel had recently divorced, his brother was paralyzed in an accident, and his father had undergone eme gency heart surgery, all of which prompted him to attest to his own professional incompetence).

In the instant case, Hall's counsel called three mitigating witnesses to the stand, attempted to contact Hall's wife and mother, and made an eloquent closing argument which appealed to the trial court's sense of mercy. *Cf. Kubat v. Thieret,* 867 F.2d 351, 367–68 (7th Cir.), *cert. denied,* 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989) (defense counsel called no character witnesses at the sentencing hearing and his closing argument was "grossly substandard"); *United States ex rel. Emerson v. Gramley,* 883 F.Supp. 225, 243 (N.D.Ill.1995) (counsel declined to introduce any mitigating evidence and submitted the case to the jury without argument); *Blake v. Kemp,* 758 F.2d 523, 533–35 (11th Cir.), *cert. denied,* 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985) (counsel failed to present any character witnesses at all); *King v. Strickland,* 748 F.2d 1462, 1463–64 (11th Cir.1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2020, 85 L.Ed.2d 301 (1985) (counsel failed to present available character witnesses and his "closing argument served only to dehumanize his client"); *Gaines v. Thieret,* 665 F.Supp. 1342, 1365 (N.D.Ill. 1987), *rev'd on other grounds,* 846 F.2d 402 (7th Cir.1988) (counsel's exceedingly short closing argument provided no reason for the jury not to impose the death penalty). Thus, all of Petitioner's cases are inapposite and do not persuade the Court that prejudice has been adequately shown here.

While the Court could stop its analysis at this point on the basis that the lack of prejudice to Petitioner is dispositive of his claims, the Court wishes to clarify that Hall cannot meet the first prong of *Strickland* either. In assessing whether counsel's representation fell below an objective standard of reasonableness, *Strickland* requires the Court to engage in a strong presumption that counsel has rendered adequate assistance and exercised reasonable professional judgment. 466 U.S. at 689, 104 S.Ct. at 2065. The test has nothing to do with what the best lawyers have done, nor even what most good lawyers would have done. We ask only whether some reasonable lawyer at the hearing could have acted, in the circumstances, as defense counsel acted at the hearing. *Wa-*

death shall be directly to the Supreme Court as a matter of right.").

*ters v. Thomas,* 46 F.3d 1506, 1512 (11th Cir.1995) (*en banc*), *cert. denied,* —— U.S. ——, 116 S.Ct. 160, 133 L.Ed.2d 103 (1995). Moreover, every effort must be made to eliminate the distorting effects of hindsight and to evaluate counsel's performance from their perspective at the time of the relevant conduct. *Id.*

More specific to the instant case, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Id.* 466 U.S. at 690–91, 104 S.Ct. at 2066. Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitations on investigation. *Id.* Because mitigation is a vaguer concept than guilt, what exactly counsel must do to determine the presence of factors mitigating the gravity of the defendant's conduct is less clear. *Stewart,* 74 F.3d at 135. Presumably the lawyer is not required to investigate the defendant's past with the thoroughness of a biographer. The resources of defense lawyers are limited, and they have only a short time to prepare for the sentencing hearing. *Id. See also Waters,* 46 F.3d at 1514 ("That other witnesses could have been called or other testimony elicited usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, postconviction counsel will inevitably identify shortcomings in the performance of counsel ... but perfection is not the standard of effective assistance.").

The Court believes that, as in *Strickland,* Hall's counsel made a strategic decision that made the particular investigations unnecessary. In *Strickland,* the petitioner's counsel decided not to present a number of available mitigation witnesses; rather, counsel's strategy was to argue for the extreme emotional distress mitigating circumstance and to rely as fully as possible on the petitioner's acceptance of responsibility for his crimes. *Id.* at 699, 104 S.Ct. at 2070. The Supreme Court found that counsel had exercised reasonable professional judgment in this regard, reasoning:

> The trial judge's views on the importance of owning up to one's crimes were well known to counsel. The aggravating circumstances were utterly overwhelming. Trial counsel could reasonably surmise from his conversations with respondent that character and psychological evidence would be of little help. Respondent had already been able to mention at the plea colloquy the substance of what there was to know about his financial and emotional troubles. Restricting testimony on respondent's character to what had come in at the plea colloquy ensured that contrary character and psychological evidence and respondent's criminal history, which counsel had successfully moved to exclude, would not come in. On these facts, there can be little question, even without application of the presumption of adequate performance, that trial counsel's defense, though unsuccessful, was the result of reasonable professional judgment.

*Id.*[8]

Likewise, in the instant case, Ahlemeyer testified at the post-conviction hearing that his strategy in preparing for sentencing was "to focus in on an argument based on just generally on the theory opposing the death penalty in all cases." This approach was taken because Ahlemeyer believed that the evidence in aggravation was overwhelming

---

8. *See also Burger v. Kemp,* 483 U.S. 776, 794–95, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987) (failure to submit any mitigating evidence was not constitutionally ineffective assistance where counsel's strategy was to emphasize the coindictee's culpability for the crime); *Francis v. Dugger,* 908 F.2d 696, 703 (11th Cir.1990) ("We reject Francis's argument that his counsel rendered deficient assistance during the penalty phase of the trial. Trial counsel made a decision to deliver a highly impassioned, emotional argument which, rather than focusing on Francis, emphasized the Easter season, forgiveness, compassion, and the value of life. We cannot say that this strategy was unreasonable given counsel's reasoned belief (based upon previous conversations with the trial judge and the court's plea offers) that the trial judge would follow a life recommendation."); *Kubat,* 867 F.2d at 368 ("It is true ... that in some cases counsel might reasonably make a decision to omit evidence in mitigation and rely instead on an alternative strategy, such as a plea for mercy.").

and that it was not "going to do a lot of good to Hall to try to prove that when he was thirteen years old he was a good boy." It was Ahlemeyer's judgment before sentencing "that mitigation was pretty scarce." Ahlemeyer thought it was better to attack the death penalty because he knew Judge Caisley to be a very religious and sympathetic man who personally opposed the death penalty and had never previously sentenced anyone to death.

Thus, just as the petitioner's counsel in *Strickland* based his strategy on his belief that the judge would be sympathetic to someone who owned up to his crimes, Ahlemeyer based his strategy upon his belief that Judge Caisley was a religious and sympathetic man who would hesitate to impose the death penalty. Moreover, the aggravating circumstances in both *Strickland* and the instant case were so stacked against the defendant that the introduction of good character evidence would not have had a decisive effect upon the outcome. In both cases, some evidence in mitigation had already been introduced to show the petitioner's good character.[9] Here, Hall himself took the stand. His minister, Lloyd Shaddle, testified that Hall attended bible study classes and expressed concern for his family. A psychiatrist, Dr. Syed Ali, who had examined Hall, testified that he found Hall to be anxious and depressed about the forthcoming sentence. Moreover, Ahlemeyer contends that he attempted to get Hall's wife and mother to attend the trial and the sentencing hearing, but that he was unsuccessful. These similarities between *Strickland* and the instant case demonstrate Ahlemeyer's use of reasonable professional judgment in not calling the ten mitigation witnesses presented by Hall.[10]

 Moreover, Petitioner's lack of cooperation contributed to the alleged ineffectiveness in this case and reinforces the Court's finding that reasonable professional judgment was exercised here. The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. *Id.* at 691, 106 S.Ct. at 2066. What investigation decisions are reasonable depends critically on such information. *Id.* Conversely, where the petitioner's deliberate noncooperation has adversely affected counsel's ability to represent him, petitioner cannot then turn around and claim that his counsel was constitutionally ineffective. *See Davis v. Greer*, 13 F.3d 1134, 1139 (7th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 328, 130 L.Ed.2d 287 (1994) (no Sixth Amendment violation where petitioner refused to allow counsel to present evidence of his mental condition at his capital sentencing hearing); *Resnover v. Pearson*, 965 F.2d 1453, 1460 (7th Cir.1992), *cert. denied*, 508 U.S. 962, 113 S.Ct. 2935, 124 L.Ed.2d 685 (1993) (no Sixth Amendment violation where petitioner "deliberately absented himself from the penalty phase of the trial over the strong protestations of his counsel"); *United States ex. rel. Kleba v. McGinnis*, 796 F.2d 947, 957 (7th Cir.1986) (holding that the defendant was "the one primarily responsible" for failing to locate a key witness; because the defendant failed to inform counsel of that witness, counsel's failure to locate her was not deficient).

The record is replete with examples of Petitioner's complete lack of cooperation, including his own repeated declarations that he would not assist or cooperate with his defense counsel in any way. For instance, Hall refused to allow visits from Ahlemeyer and the probation officer into the prison. It is no wonder, then, that Hall's counsel did not have the opportunity to rebut the State's presentence report. Petitioner asserts that, "after the physical assault [in chambers], Mr.

---

**9.** Petitioner's claim is simply not true that his trial counsel "complete[ly] abandon[ed] their duty to investigate for mitigating evidence."

**10.** There is one significant difference between *Strickland* and the instant case. In *Strickland*, counsel's restriction of character evidence ensured that contrary character and psychological evidence and respondent's criminal history

would not come in. Here, however, Hall's criminal history was already before Judge Caisley in the presentence report. Nevertheless, the Court does not believe that this difference is enough to distinguish the instant case from that of *Strickland*. In *Strickland*, the Court found reasonable professional judgment "even without application of the presumption of adequate performance." When that presumption is applied here, Ahlemeyer's conduct must be deemed professional.

Hall cooperated with his counsel throughout the rest of the trial and sentencing hearing." However, Ahlemeyer's testimony that after the assault, he did not have much of a relationship with Hall "from that point on," belies this assertion.[11]

Ahlemeyer also testified at the post-conviction hearing that he believed Hall's conduct was "just an act" intended to "create error" at trial so that his conviction and sentence would be overturned. The Illinois Supreme Court came to this same conclusion on direct review. *Hall I,* 499 N.E.2d at 1346. There are a number of specific instances in the record which support this view. For instance, Hall testified that his refusal to cooperate with Ahlemeyer was a "deliberate and rational act" and stated in open court:

> I am not going to cooperate with him and if he comes within an arm's length of me I will spare you the particulars. If this is what I have to do to get him off this case, I will rise to that occasion. I can only get an assault charge.

Ahlemeyer testified that Hall later told him, "[w]ell, you know, that last little threat I made was just for business, you know, and nothing personal." Hall also sent a letter to Ahlemeyer which stated the following:

> I'm willing to rises to other measures as much as I deem necessary to secure Attorney other than local "P.D." or private counsel. Herethereafter sir, do not come withend arm length of my presents. I'll spare you the particulars, but I will follow through on this promise.

(grammatical errors in original).

It is also highly unusual that Hall would waive the jury and choose Judge Caisley to determine both his guilt and his sentence after he had just physically attacked the court. When questioned in the post-conviction proceeding about his jury waiver decision, Hall denied that he did it in order to create error or because he knew the judge was not likely to impose the death penalty. However, he could not point to any single

event that prompted him to change his mind in this regard. One logical conclusion is that he wanted the judge to decide the case in order to introduce error into the proceedings. Thus, the Court has no reason to doubt the Illinois Supreme Court's factual findings on this matter and must accept them as true. *Purkett,* —— U.S. at ——, 115 S.Ct. at 1771; 28 U.S.C. § 2254(d).

■ Hall's actions in refusing to cooperate with his counsel detrimentally affected his counsel's ability to gather mitigating evidence for the sentencing hearing. "[I]n assessing an investigation, if certain evidence or witnesses could not reasonably have been discovered without the defendant's cooperation and the defendant did not cooperate, defense counsel's failure to find the evidence cannot be ineffective assistance." *Kleba,* 796 F.2d at 961 (Cudahy, J., concurring in part and dissenting in part). *See also Davis,* 13 F.3d at 1139; *Resnover,* 965 F.2d at 1460; *Kleba,* 796 F.2d at 957. This further detracts from Hall's ineffective assistance claim here. While Hall did apparently give counsel a list of potential character witnesses prior to the sentencing hearing, his failure to discuss those witnesses with counsel or the information they might provide supports the presumption that Ahlemeyer and Skelton were effective here.

■ As for counsel's failure to present a mitigation expert at the sentencing hearing, Ahlemeyer testified that while he was aware of the existence of a mitigation expert at the time, "they weren't so popular then." He explained, "I guess it is just because it wasn't being done ... it was the type of thing that was just getting started." Skelton also testified that he was not aware of the notion of mitigation experts in 1984. In light of the cautionary holding in *Strickland* that every effort must be made to eliminate the distorting effects of hindsight and to evaluate counsel's performance from their perspective at the time of the relevant conduct, 466 U.S. at 689, 104 S.Ct. at 2065, the Court finds that

---

11. Moreover, it is unreasonable for Hall to expect that his counsel had a constitutional duty to inform him that he should allow the probation officer to visit him in prison so that he could respond to the presentence report. In light of

Hall's previous belligerent behavior against Ahlemeyer, Skelton, and Judge Caisley, Ahlemeyer could reasonably have believed that Hall would have refused the visit with the probation officer even if he had understood the nature of the visit.

Ahlemeyer's failure to present a mitigation expert in 1984 was reasonable and did not constitute ineffective assistance of counsel. Petitioner fails to cite any constitutional requirement that a mitigation expert be called to testify either in 1984 or at the present time. Absent such a requirement, it was not unprofessional of Hall's counsel to fail to call one.

■ In addition, Judge Caisley stated on post-conviction review that, "[n]ormally, there is no pre-sentence report prepared at all in capital cases" because the matter goes straight to the jury for sentencing. It was only because there happened to be a bench trial and a period of time existed between Hall's conviction and the sentencing hearing that such a report was ordered. Under such circumstances, the Court cannot say that counsel's failure to be involved with the preparation of the presentence report constituted constitutionally ineffective assistance.

In sum, Petitioner has failed to meet either requirement under *Strickland* for proving constitutionally ineffective assistance of counsel. Moreover, his argument regarding the presentence report has been procedurally defaulted. Thus, the Court denies Petitioner's Sixth Amendment claims.

### III. Jury Sentencing Waiver

■ Petitioner asserts that his rights under the Eighth and Fourteenth Amendments were violated in that he did not knowingly and intelligently waive his right to a sentencing jury because neither the court nor counsel informed him that a jury's decision to impose the death penalty must be unanimous. This argument states a federal constitutional claim. *See Hicks v. Oklahoma*, 447 U.S. 343, 346, 100 S.Ct. 2227, 2229, 65 L.Ed.2d 175 (1980). However, it is foreclosed by *United States ex. rel. Wandick v. Chrans*, 869 F.2d 1084, 1088–89 (7th Cir. 1989) citing *United States ex. rel. Williams v. DeRobertis*, 715 F.2d 1174, 1179–81 (7th Cir.1983), *cert. denied*, 464 U.S. 1072, 104 S.Ct. 982, 79 L.Ed.2d 219 (1984), in which the Seventh Circuit held that there is no consti-

tutional right to be informed of the unanimity requirement under Illinois law in order to effectively waive one's right to a jury trial.

While *Wandick* dealt with the application of a jury waiver to the guilt phase of the trial, the Court does not believe that the Seventh Circuit would change its holding simply because the jury waiver here applies to the capital sentencing phase. In either phase of the trial, the same underlying rationale applies that the defendant need not be given "an exhaustive knowledge of all the doctrinal subtleties of Sixth Amendment jurisprudence" in order to effectuate a jury waiver. *Id.* at 1088–89 *citing Williams*, 715 F.2d at 1179–80.[12]

Petitioner argues that the differences between the jury scheme in the guilt phase and the sentencing phase in Illinois is a "unique circumstance" which merits finding a constitutional violation here. During the guilt phase, the jury must return a unanimous verdict of guilt or acquittal in order to complete the trial; however, at the death penalty sentencing phase, the jury must unanimously vote for the death penalty or the defendant is automatically sentenced to life imprisonment. Such a circumstance is hardly "unique" to Hall; every person charged with the death penalty in Illinois has undergone this two phase trial. Yet, no court in Illinois or the Seventh Circuit has found the failure to inform a defendant of the unanimity requirement in the sentencing phase to be a constitutional violation, and the Court declines to do so here. The fact that Hall had already undergone two trials and understood only the guilt phase method of jury deliberation is not enough to change the Court's opinion on this issue.

■ In addition, the fact that Hall decided to revoke his jury waiver "at the earliest possible time after he learned of the unique unanimity provision" does not change this result. First, there can be no constitutional violation where the constitutional right upon

12. The Court's prior finding that Hall's counsel were constitutionally effective also supports the

fact that Hall knowingly waived his right to a

which it is allegedly based is nonexistent.[13] *Chrans,* 869 F.2d at 1088–89. Second, the time lapse between the waiver decision and Hall's change of mind is irrelevant. Once an effective waiver has been completed, it is final. Otherwise, there would be no repose to such decisions. For these reasons, Petitioner's claim must be denied.

## IV. The Trial Judge's Failure to Recuse Himself

Next, Petitioner argues that his rights under the Eighth and Fourteenth Amendments were violated because Judge Caisley refused to recuse himself after Hall had physically attacked him. · Even in a death case, bad appearances alone do not require disqualification of a judge. *Del Vecchio v. Illinois Dept. of Corrections,* 31 F.3d 1363, 1372 (7th Cir.1994) *(en banc ),* cert. denied, — U.S. ——, 115 S.Ct. 1404, 131 L.Ed.2d 290 (1995). There is a presumption of "honesty and integrity of those serving as adjudicators." *Id.* at 1375 *quoting Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975). Recusal is required only when the biasing influence is strong enough to overcome that presumption so that we may presume actual bias. *Id.* This occurs in situations "in which experience teaches that the possibility of actual bias is too high to be constitutionally tolerable." A court must be convinced that the particular influence, "under a realistic appraisal of psychological tendencies and human weakness," poses "such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Id. quoting Withrow,* 421 U.S. at 47, 95 S.Ct. at 1464. An example of this is a situation in which the judge has a direct pecuniary interest in the outcome of the case. *Id.* at 1373.

However, the Seventh Circuit in *Wilks v. Israel,* 627 F.2d 32 (7th Cir.1980), *cert. denied,* 449 U.S. 1086, 101 S.Ct. 874, 66 L.Ed.2d 811 (1981), found that a defendant's physical attack of a judge does *not* constitute a situation in which bias can be presumed. In that case, the defendant had acted uncooperatively during the pretrial proceedings. At a pretrial hearing, he threw a stamping machine and microphone at the judge. At one point, while he was on the witness stand and the jury was not in the courtroom, he jumped out of his chair and physically assaulted the judge. *Id.* at 36. Immediately after the assault, the judge stated:

> I am going to say it for the record, he is going away for so long they are going to forget that they ever knew him, and I want any reviewing court to know what my intentions are.

*Id.* Later, the judge relented and stated that he would treat the defendant fairly for the rest of the trial. In fact, a review of the record revealed that the defendant had received a fair trial. *Id.* at 37.

The Seventh Circuit held that in order to prove a constitutional violation, the defendant had to show that the refusal to recuse was a "fundamental defect which inherently results in a complete miscarriage of justice." *Id.* at 37 *quoting Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962). The court found that "as could be expected, the trial judge reacted adversely to the petitioner's unruly behavior." *Id.* However, the court held:

> A petitioner's deliberate attack on the trial judge calculated to disrupt the proceedings will not force a judge out of a case. *Mayberry v. Pennsylvania,* 400 U.S. 455, 463, 91 S.Ct. 499, 504, 27 L.Ed.2d 532 (1971). To permit such an attack to cause a new

jury trial. *Chrans,* 869 F.2d at 1088; *Williams,* 715 F.2d at 1182.

allegation that the ensuing bench trial was in any way unfair." 715 F.2d at 1181. However, the Court does not believe that these factors are crucial to the Seventh Circuit's holding in *Williams.* The Seventh Circuit's subsequent holding in *Chrans,* which relied upon *Williams,* reaches the same conclusion without setting forth all of those extenuating factors. 869 F.2d at 1088–89. Only the competence of trial counsel was discussed. *Id.* at 1088.

**13.** In *Williams,* the Seventh Circuit appeared to condition its holding on the following factors: "the defendant was represented by competent counsel, there were no extenuating circumstances to indicate that these particular attributes would have been of particular significance to the defendant, and there is no indication or

trial before a new judge would encourage unruly courtroom behavior and attacks on the trial judge and would greatly disrupt judicial administration.

*Id.* The Seventh Circuit then reviewed the entire record to find any evidence of actual bias. When none was found, the court concluded that no constitutional violation had occurred. *Id.*

In response to the petitioner's argument that the test should be the appearance of prejudice, not actual prejudice, the Seventh Circuit held:

> Petitioner's argument, as we read it, would require a judge to remove himself from a case every time a defendant attacks him. In fact, the more vicious the attack the stronger the argument for recusal would be. We decline to adopt such a *per se* rule. Instead, we will examine the trial to ensure that the trial judge, despite good cause for adverse feelings toward a defendant, has conducted a fair trial.

*Id.* at 37 n. 6. Thus, using the policy that a defendant should not be able to profit from his own misconduct, the Seventh Circuit has struck a balance requiring recusal in the event of a physical attack on the judge only when the reviewing court finds actual bias in the record, and not merely the appearance of bias.

■ Petitioner argues that *Wilks* is distinguishable. The judge who was attacked in *Wilks* merely presided over a jury trial and played no role in deciding the fate of the defendant, *id.* at 37, while here, Judge Caisley conducted a bench trial and made the decision to sentence Hall to death. However, the Court does not believe that this is a valid distinction. Even after the attack on Judge Caisley and his refusal to recuse himself from the case, Hall made a conscious decision to have Judge Caisley decide his sentence. Because Hall could have chosen a jury sentencing, but deliberately decided to forgo that right, he cannot now complain that the mere appearance of bias by the judge is a

constitutional violation. A contrary rule would encourage defendants to attack their judges and waive their right to a jury so as to create error at the trial.

■ In reviewing the record in the instant case, the Court can find no evidence of actual bias by the judge. All of Petitioner's arguments on this issue ring hollow. There is no indication in the record that Judge Caisley considered Hall's attack upon him to be an aggravating factor in his decision to impose the death penalty. Petitioner's singular citation to Judge Caisley's remark that, "[a]t times, [Hall] could be very respectful," is taken out of context and proves absolutely nothing about Judge Caisley's supposed bias against Petitioner. Petitioner's other attempts to show actual bias are also futile and are based on erroneous assumptions of fact and law. For instance, the mere fact that Judge Caisley did not allow Hall's counsel to withdraw on the eve of trial is not a valid ground by which to show actual bias.[14]

■ Nor do the cases cited by Petitioner stand for the proposition that Judge Caisley had to consider the assault in order to render a properly individualized decision in Hall's case. While the sentencing authority has the obligation to consider "the character and record of the individual offender and the circumstances of the particular offense," *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976), it need only consider the evidence presented by the parties at the hearing.

■ There is no requirement that the sentencing authority make an independent investigation into the defendant's life or rely upon personal knowledge concerning his character, nor would it be proper to do so. *See Dotson v. Peabody Coal Co.*, 846 F.2d 1134, 1138 (7th Cir.1988) ("[I]t is unfair and irrational for the trier of fact to rely on evidence outside the record."); *People v. Barnes*, 48 Ill.App.3d 226, 6 Ill.Dec. 521, 524, 363 N.E.2d 50, 53 (1st Dist.1977) ("A trial

---

**14.** Contrary to Petitioner's assertions, Judge Caisley's statement at the sentencing hearing that there was no evidence in mitigation was a valid interpretation of Illinois law (as explained in Part I above). Moreover, Judge Caisley's finding at

the post-conviction hearing that Father Means' testimony was merely cumulative of Dr. Shaddle's was also reasonable (as explained in footnote 5 above).

judge, sitting as the trier of fact, is limited to the record made at trial, and a determination made by him based upon private knowledge constitutes a denial of due process."). Here, neither the prosecution nor defense counsel introduced any evidence regarding the assault upon Judge Caisley. Thus, Judge Caisley had no obligation to consider the assault upon him as an aggravating factor at the sentencing hearing and can be presumed not to have done so. *See United States v. Miller*, 800 F.2d 129, 136 (7th Cir.1986) ("[A]s a legal matter the district court [in a bench trial] is presumed to have considered only relevant and admissible evidence in reaching its factual findings.").

In light of the Seventh Circuit's holdings in *Del Vecchio* and *Wilks*, the Court finds that no constitutional violation exists here. The Court also holds that Petitioner's reliance on *Mayberry* and *In re Murchison*, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955), is inapposite. In *Mayberry*, the United States Supreme Court held that a judge who had been subject to repeated insults upon his character during trial could not preside over a separate contempt proceeding against the defendant. 400 U.S. at 466, 91 S.Ct. at 505. However, *Mayberry* concerned due process protections for the contemnor, a separate proceeding from the trial in which the contempt arose. The Court made clear that a trial judge, by means of personal attacks by a defendant, could not be driven out of an *ongoing* case, such as in the present situation. *Id.* at 463, 91 S.Ct. at 504. *See Wilks*, 627 F.2d at 37 n. 5 (explaining this distinction).

Similarly, in *Murchison*, the Supreme Court found that the defendants' due process rights had been violated where the judge had acted as a one man grand jury in investigating and bringing contempt charges against the defendants and had subsequently sat in judgment on those charges. 349 U.S. at 137–38, 75 S.Ct. at 626. The Supreme Court reasoned that due process was violated because the judge relied upon his own personal knowledge of the grand jury proceedings in order to convict the defendants. *Id.* at 138, 75 S.Ct. at 626. By contrast, here Petitioner has failed to show that Judge Caisley took

the assault upon him into account when he decided to sentence Hall to death. Moreover, he played no direct role in the prison's revocation of Hall's good time credit for the assault. Thus, because Judge Caisley did not use his own personal knowledge in sentencing Hall, *Murchison* is inapposite. For these reasons, Petitioner's claim must be denied.

## V. *"Irretrievable Loss" of the Attorney–Client Relationship*

Petitioner also contends that his constitutional right to effective assistance of counsel under the Sixth and Fourteenth Amendments was violated because the attorney-client relationship had been "irretrievably lost." There can be no doubt that the relationship between Hall and Ahlemeyer and Skelton was strained. On various occasions, Hall asked for new counsel or to proceed *pro se* while Ahlemeyer requested to withdraw as counsel due to Hall's noncooperation. Hall even threatened Ahlemeyer in open court and sent him a threatening letter, which resulted in Hall being shackled at Ahlemeyer's request. Hall also stated in court that he was "afraid" of Ahlemeyer. This situation culminated in Hall's physical assault on Ahlemeyer and Skelton just one day before his trial was to begin. After the attack, both Ahlemeyer and Skelton made a motion to withdraw from the case, stating that they could not "ethically or morally" proceed on Hall's behalf and that the attorney-client relationship had been "irretrievably lost." Judge Caisley denied the motion, stating that "under the circumstances, just minutes before trial is to begin I don't think at this point I can in all fairness allow defense counsel to withdraw."

 The State first counters that Hall's ineffective assistance claim was not fairly presented to the Illinois courts as a constitutional issue and thus fails to state a claim qualifying for federal habeas relief. In order to be entitled to federal habeas relief, the petitioner must have presented both the relevant facts and controlling legal principles of federal law or the U.S. Constitution to the state courts. *Picard v. Connor*, 404 U.S. 270, 277, 92 S.Ct. 509, 513, 30 L.Ed.2d 438

(1971). In *Verdin v. O'Leary*, 972 F.2d 1467, 1473–74 (7th Cir.1992) *citing Daye v. Attorney General of State of N.Y.*, 696 F.2d 186, 194 (2d Cir.1982) (*en banc*), the Seventh Circuit adopted a "fair presentment" test to determine whether a petitioner has fairly presented an issue to the state courts so as to avoid procedural default:

> If petitioner's argument to the state court did not: (1) rely on pertinent federal cases employing constitutional analysis; (2) rely on state cases applying constitutional analysis to a similar factual situation; (3) assert the claim in terms so particular as to call to mind a specific constitutional right; or (4) allege a pattern of facts that is well within the mainstream of constitutional litigation, then the court will not consider the state courts to have had a fair opportunity to consider the claim. However, the presence of any one of these factors, particularly factors (1) or (2), does not automatically avoid a waiver; the court must consider the facts of each case.[15]

What is important is that the *substance* of the federal claim be fairly presented to the state court. *Id.* 972 F.2d at 1474.

In the instant case, Hall argued to the Illinois Supreme Court that the trial judge had erred in refusing to appoint new counsel after Hall struck Skelton on the head with a chair. *Hall I*, 102 Ill.Dec. at 331–32, 499 N.E.2d at 1344–45. Hall asserted that because of that incident as well as his previous complaints about representation, he had "good cause" under Ill.Rev.Stat.1971 ch. 38, par. 113–3(b) to replace the public defender with private court-appointed counsel. *Id.* The Illinois Supreme Court analyzed Hall's claim under the revised statutory language which required a showing of "prejudice" to the defendant by the appointment of the public defender, and found no such prejudice because the problems in representation had resulted from Hall's own misconduct. *Id.* at 332–33, 499 N.E.2d at 1345–46.

The Court believes that the second and fourth factors in *Verdin* have been satisfied here. In its decision, the Illinois Supreme Court relied in part upon "state cases applying constitutional analysis to a similar factual situation" when it cited two Illinois cases for the proposition that the "defendant [is] estopped from asserting ineffective assistance of counsel when [the] claim arises from [the] defendant's lack of cooperation." *Hall I*, 102 Ill.Dec. at 333, 499 N.E.2d at 1346. Moreover, Petitioner alleged a "pattern of facts that is well within the mainstream of constitutional litigation." In order to establish the need for replacing the public defender with private counsel, Petitioner necessarily had to allege facts showing how the public defender had been ineffective at his trial so as to cause "prejudice" under the statute. A similar factual pattern arises in almost every case involving constitutionally ineffective assistance of counsel where reasonable assistance and prejudice must be established. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. Thus, the Court finds that Petitioner's claim was properly presented to the state courts and is not procedurally defaulted here. *Verdin*, 972 F.2d at 1473–74.

■■■ However, Petitioner's claim cannot succeed on the merits. As noted in Part II above, it was Hall's own misconduct and failure to cooperate with his counsel that ultimately led to his counsel's inability to represent him to the best of their ability. This type of behavior precludes a finding of constitutionally ineffective assistance of counsel. *See Davis*, 13 F.3d at 1139; *Resnover*, 965 F.2d at 1460; *Kleba*, 796 F.2d at 957.

From the very start of Ahlemeyer's representation, Hall wrote letters to Judge Caisley complaining that he was unable to establish a rapport with Ahlemeyer out of fear that the public defender's ties to the community and political concerns would weaken his ability to represent Hall. Hall also alleged that a "conflict of interest" between himself and Ahlemeyer would be an "understatement." However, Hall cannot point to even one specific instance in which Ahlemeyer was actually deficient in representing him. Hall cannot use his paranoid fantasies of collusion between the prosecution and public defender's

---

**15.** While the fair presentment test was devised to analyze the exhaustion of state remedies, the Seventh Circuit in *Verdin* held that the test was also useful in analyzing procedural default under § 2254. 972 F.2d at 1473.

office to create an actual conflict of interest in the attorney-client relationship. Absent some factual basis for these allegations, Hall was completely out of order in refusing to cooperate with his counsel.

Hall's harassing behavior continued throughout the pretrial period when he threatened to assault Ahlemeyer in open court and wrote Ahlemeyer a letter reiterating this view. When Judge Caisley did try to accommodate Hall by appointing Skelton as co-counsel, Hall returned the favor by striking Skelton on the head with a chair and Judge Caisley on the head with his fist. Hall's belligerent behavior in refusing to see Ahlemeyer or any other court officer in prison further detracted from his counsel's ability to adequately represent him. Despite these self-destructive incidents, the Court agrees with the Illinois Supreme Court that "Ahlemeyer and Skelton performed competently before and during trial despite their unhappy position of being between the defendant's wish that they be discharged and the court's insistence that they remain as coun-

sel." *Hall I*, 102 Ill.Dec. at 332, 499 N.E.2d at 1345.

■ Petitioner attempts to improperly shift the focus of the ineffective assistance inquiry to counsel's state of mind concerning the attorney-client relationship. However, the Seventh Circuit has found that "the focus of *Strickland* is on the *performance* of counsel rather than his state of mind." *Kleba*, 796 F.2d at 954 (emphasis added). Thus, "an allegation that an attorney was unwilling to serve as defense counsel is insufficient to overcome the [*Strickland*] presumption that counsel has 'rendered adequate assistance.'" *Id.* This accounts for Ahlemeyer and Skelton's own remarks that the attorney-client relationship had been "irretrievably lost" and their various motions to withdraw as counsel. Despite these remarks, the record reveals that Hall's representation by counsel was fair and unbiased. Thus, the Court cannot find a constitutional violation here.[16]

■ Hall wishes to justify his misconduct against his attorneys by alleging that Judge

16. Petitioner cites to *Holloway v. Arkansas*, 435 U.S. 475, 484–86, 98 S.Ct. 1173, 1179, 55 L.Ed.2d 426 (1978), for the proposition that Judge Caisley was obligated to heed counsel's concerns that they could no longer represent Hall after he assaulted them in chambers. However, *Holloway* is one in a series of cases involving "an actual conflict of interest" that are distinct from *Strickland*'s cause and prejudice test. *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). An actual conflict of interest results if "the defense attorney was required to make a choice advancing his own interests to the detriment of his client's interests." *Stoia v. United States*, 22 F.3d 766, 771 (7th Cir.1994). Examples of such conflicts include the representation of multiple defendants, *Cuyler*, 446 U.S. at 349–50, 100 S.Ct. at 1718–19, and the representation of a defendant after counsel had signed a consent decree with the district attorney's office stating that he would not represent such clients. *Stoia*, 22 F.3d at 772.

Another line of cases in which *Strickland* does not apply includes situations where actual or constructive assistance of counsel has been denied altogether during a critical stage of the proceedings. *Perry v. Leeke*, 488 U.S. 272, 279, 109 S.Ct. 594, 599, 102 L.Ed.2d 624 (1989); *see, e.g., United States ex. rel. Thomas v. O'Leary*, 856 F.2d 1011, 1016–17 (7th Cir.1988) (where counsel failed to file a brief on appeal from the trial court's suppression order, prejudice need not be shown); *Siverson v. O'Leary*, 764 F.2d 1208, 1217 (7th Cir.1985) (where counsel was com-

pletely absent during jury deliberations and the return of the verdict, prejudice need not be shown). A subset of such cases occurs when the state interferes with counsel's representation so as to deprive the defendant of assistance during a critical stage of the proceedings. *See, e.g., Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) (where court denied defendant access to his counsel during a 17 hour recess in the trial, prejudice need not be shown to prove constitutionally ineffective assistance).

However, the instant case bears no resemblance to these cases. Ahlemeyer and Skelton were not forced to "make a choice advancing [their] own interests to the detriment of [their] client's interests." *Stoia*, 22 F.3d at 771. The possibility that they might have to testify against Hall was speculative at best. Nor was the assistance of counsel denied altogether at any critical stage in this case. *Perry*, 488 U.S. at 279, 109 S.Ct. at 599. Petitioner's counsel were present at all stages of the trial and represented him to the best of their ability in light of Hall's own misconduct. During the guilt phase, Hall was able to pass notes to his counsel in order to assist in his representation. At the sentencing phase, counsel put on three witnesses, attempted to procure two more, and made an eloquent closing argument to the court. Thus, *Holloway* and *Cuyler* are inapplicable to the instant case and Petitioner's reliance upon those cases to show that Judge Caisley was obligated to grant defense counsel's motion to withdraw is unfounded.

Caisley wrongfully refused to replace the public defender with private counsel of his own choice. The Sixth Amendment right to counsel does afford a defendant a "fair opportunity to secure counsel of his own choice." *Kleba*, 796 F.2d at 951–52 *citing Powell v. Alabama*, 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932). However, this does not hold true when the defendant is indigent and the State legislature has set up an exclusive system by which to appoint the Public Defender as counsel for such persons. An indigent has no absolute right to counsel of his choice. *United States v. Davis*, 604 F.2d 474, 478 (7th Cir.1979) *citing United States v. Hampton*, 457 F.2d 299, 301 (7th Cir.), *cert. denied*, 409 U.S. 856, 93 S.Ct. 136, 34 L.Ed.2d 101 (1972). A court's policy "not to honor a defendant's request for the appointment of a particular attorney is rational and reasonably necessary to the orderly administration of the system of providing defense services to those financially unable to retain counsel on their own." *Id.*

Moreover, the Sixth Amendment "does not give an accused the power to manipulate his choice of counsel to delay the orderly progress of his case." *United States v. Robinson*, 20 F.3d 270, 275 (7th Cir.1994). The exercise of the right to counsel of choice "must at times give way to the need for a fair and efficient administration of justice." *Id.* A criminal defendant cannot use gamesmanship to create a conflict of interest with his own attorney in order to obtain newly appointed counsel. *Atkins v. Wright*, 843 F.Supp. 457, 460–61 (N.D.Ind.1994).

While in hindsight, Judge Caisley's decision not to allow Ahlemeyer and Skelton to withdraw might have been a hasty one, it was not an abuse of discretion, and certainly not a violation of the Sixth or Fourteenth Amendments. Hall's use of gamesmanship [17] to achieve his goal of obtaining new counsel backfired against him by negating the assistance of his present counsel. However, this was not a good reason for the trial court to grant Hall's request. Such a ruling would only encourage defendants to use the Sixth Amendment "to manipulate [their] choice of counsel to delay the orderly progress of [their] case." *Robinson*, 20 F.3d at 275.

Petitioner focuses only upon Judge Caisley's denial of Ahlemeyer and Skelton's motion to withdraw after the attack in chambers. However, this decision cannot be viewed in a vacuum. At numerous times in the past, Hall had unjustifiably attempted to replace his counsel. The trial had been continued for almost a year in order to accommodate Hall's requests for new counsel and his refusal to cooperate with his present counsel. Finally, the day before the trial was to begin and after the jury had been selected, Hall attacked the judge and counsel in chambers. If Judge Caisley had allowed Ahlemeyer's and Skelton's motion to withdraw at that point, Hall would have succeeded in disrupting the entire trial.

Even at this point, Judge Caisley gave Hall another chance to proceed *pro se*. However, during the court's questioning to determine whether his waiver of counsel was knowing and voluntary, Hall once again became belligerent and claimed that he did not understand anything the court was telling him. Thus, the court properly found that Hall's decision was not intelligently made and proceeded with the trial. Under these circumstances, the Court cannot fault Judge Caisley for proceeding with the trial and refusing counsel's motion to withdraw. Thus, the Court denies Petitioner's ineffective assistance of counsel claim here.

## VI. Full and Fair Hearing on Post–Conviction Review

Petitioner asserts that he was denied a full and fair hearing on state post-conviction review because Judge Caisley: (1) refused to allow an expert in the defense of capital cases to testify regarding the ineffectiveness of Hall's trial counsel; (2) failed to appoint a mitigation expert to help establish prejudice

---

**17.** See the discussion in Part II above for evidence in the record that Hall's misconduct might have been a deliberate strategy to create reversible error at his trial. *See also Hall I*, 102 Ill.Dec. at 333, 499 N.E.2d at 1346 ("The record clearly shows that the defendant embarked on a deliberate course designed to delay and disrupt his trial, and error cannot be reasonably found in the court's denial of a substitution of counsel.").

in trial counsel's ineffective performance; and (3) failed to recuse himself from the post-conviction proceedings.

 Habeas relief is only appropriate when a petitioner is being held in violation of the Constitution, treaties, or laws of the United States. *Escobar v. O'Leary,* 943 F.2d 711, 720 (7th Cir.1991); 28 U.S.C. § 2254. Thus, violations of state evidentiary rules may not be questioned in federal habeas proceedings unless "they render the trial so fundamentally unfair as to constitute a denial of federal constitutional rights." *Escobar,* 943 F.2d at 720 *quoting Searcy v. Greer,* 768 F.2d 906, 910 (7th Cir.), *cert. denied,* 474 U.S. 996, 106 S.Ct. 412, 88 L.Ed.2d 363 (1985). Because there is no federal constitutional requirement that the state provide a means of post-conviction review, *Williams v. State of Missouri,* 640 F.2d 140, 143 (8th Cir.), *cert. denied,* 451 U.S. 990, 101 S.Ct. 2328, 68 L.Ed.2d 849 (1981), the alleged deficiencies in the instant case must be analyzed under the standard set forth in *Escobar.*

 Under this strict standard, none of Petitioner's alleged violations rises to the level of a federal constitutional violation. Under Illinois law, the appointment of an expert on capital defense or mitigation in sentencing is within the discretion of the trial judge. *People v. Mack,* 128 Ill.2d 231, 250, 131 Ill.Dec. 551, 538 N.E.2d 1107 (1989), *cert. denied,* 493 U.S. 1093, 110 S.Ct. 1170, 107 L.Ed.2d 1072 (1990). The threshold requirement for the admission of expert testimony is that the proffered testimony be of assistance to the trier of fact. *Id.* Here, Judge Caisley found that neither of the two experts proffered by Petitioner would be helpful in his decision regarding the effectiveness of Hall's trial counsel. The Illinois Supreme Court found that the judge had not abused his discretion in making this finding. *Hall II,* 193 Ill.Dec. at 105, 626 N.E.2d at 138.

 This Court finds that Judge Caisley reasonably exercised his discretion to exclude the testimony of Hall's two proffered experts. As noted above, Ahlemeyer and Skelton were not constitutionally ineffective for their failure to present a mitigation expert at the original sentencing because at that time, such experts were not frequently used. Thus, introduction of such an expert at the post-conviction hearing would only have introduced the sort of hindsight review prohibited by *Strickland.* 466 U.S. at 689, 104 S.Ct. at 2065.

 Moreover, Judge Caisley was justified in excluding the expert on the defense of capital cases because Hall's attorneys need not have rendered "expert" assistance at his sentencing, only assistance which was "reasonably effective." *Id.* at 687, 104 S.Ct. at 2064; *see also Waters,* 46 F.3d at 1518 ("Nor is the test whether the best criminal defense attorneys could have done more."); *Albanese v. McGinnis,* 823 F.Supp. 521, 535 (N.D.Ill. 1993), *aff'd,* 19 F.3d 21, 1994 WL 83327 (7th Cir.1994), *cert. denied,* ──── U.S. ────, 115 S.Ct. 1114, 130 L.Ed.2d 1078 (1995) (holding that a consultation with an attorney experienced in capital cases "is by no means constitutionally mandated"). Thus, presenting evidence on how an expert would have handled a capital case only second-guesses the competence of Petitioner's counsel under an erroneously strict standard. *See United States ex rel. Eddmonds v. Peters,* 1995 WL 117901, at *28 (N.D.Ill.1995) (holding that judge's exclusion of two expert witnesses on state post-conviction review did not deprive defendant of a full and fair hearing).

Simply because some courts have allowed such experts to testify about the prevailing professional norms in death penalty cases does not mean that the denial of such an expert's testimony is a federal constitutional violation. In any event, Ahlemeyer testified that he had read an "immense amount of information" from the Appellate Defender's office on trying death penalty cases in order to prepare for Hall's case. Thus, his minimal competence in this area cannot be questioned.

 Similarly, the Court finds that Judge Caisley reasonably exercised his discretion in not recusing himself from the post-conviction proceedings. The Illinois Post–Conviction Hearing Act provides that the "proceeding shall be commenced by filing [a petition] with the clerk of the court *in which the conviction took place.*" 725 ILCS 5/122–1 (emphasis

added). This rule exists because the original trial judge is more aware of the relevant facts of the case than any other judge would be; thus, judicial economy is served by having such post-conviction review before the same judge. The Court has already determined in Part IV above that in the absence of actual bias, no constitutional violation occurred when Judge Caisley refused to recuse himself from the original trial or sentencing. Likewise, because the record reveals no actual bias by Judge Caisley in the state post-conviction proceeding, the Court finds no constitutional violation.

Petitioner contends that a new evidentiary hearing on Grounds I, II, and IV of his Amended Petition is "mandatory" under *Townsend v. Sain*, 372 U.S. 293, 313, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963), *overruled on other grounds by Keeney v. Tamayo–Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), which provides:

> [A] federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances. If ... (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing ... or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*See also* 28 U.S.C. § 2254(d)(2), (6) & (8).

However, the Court finds that none of these exceptions applies here. The factual determination of the state court on post-conviction review concerning Petitioner's ineffective assistance of counsel claim (Ground II) is fairly supported by the record as a whole and, for the reasons noted above, the fact-finding procedure was adequate to afford Hall a full and fair hearing. Petitioner's first ground that Judge Caisley failed to understand the law when he sentenced Hall to death needs no further factual development, as explained in Part I and footnote 4 above. Finally, there is no factual basis for Petitioner's fourth ground claim that Judge Caisley

should have recused himself from the original trial, as discussed in Part IV and footnotes 5 and 14 above.

The other cases cited by Petitioner are inapposite as well because they involve situations in which the defendant was not afforded any hearing at all. *See Siripongs v. Calderon*, 35 F.3d 1308, 1311 (9th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1175, 130 L.Ed.2d 1127 (1995); *Blackmon v. Scott*, 22 F.3d 560, 567 (5th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 671, 130 L.Ed.2d 604 (1994). Here, there was an evidentiary hearing held in the state court. Although certain evidence was excluded at the discretion of the trial judge, the Court finds that no federal constitutional violation has occurred. *See Escobar*, 943 F.2d at 720. Thus, Hall received a full and fair hearing on post-conviction review and need not receive another one in this Court.[18]

## VII. Illinois Death Penalty Act

Petitioner makes various claims regarding the unconstitutionality of the Illinois Death Penalty Statute, 720 ILCS 5/9–1, on its face and as applied. However, as Petitioner readily admits, the Seventh Circuit Court of Appeals has already rejected these arguments. Because this Court is bound by Seventh Circuit precedent, Petitioner's claims must be denied. However, for the sake of completeness, the Court will explain the reasons for its decision.

First, Petitioner claims that the statute is unconstitutional on its face "because it fails to guard against discriminatory, arbitrary and capricious exercise of prosecutorial discretion in determining which defendants shall be subjected to a death penalty hearing." This argument is closely related to Petitioner's argument that the statute "unconstitutionally vests a judicial function in the prosecution," and the Court will consider them together.

Both of these contentions were squarely rejected by the Seventh Circuit in *Silagy v. Peters*, 905 F.2d 986, 993 n. 5 (7th Cir.1990),

---

18. The Court also denies Petitioner's request to grant a discretionary hearing on his first five claims. The Court believes that the record evidence at Hall's trial and post-conviction hearing provides ample information to reach a decision on the merits of his claims.

*cert. denied,* 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991), which held that "a prosecutor's post-conviction exercise of discretion under the Illinois statute does not amount to a 'judicial function.'" The court reasoned that, "[a] prosecutor's decision under § 9–1(d) of the Illinois statute to commence or forego a death sentence hearing is not a decision to 'impose' the death sentence. Rather, the prosecutor's role is limited to that of initiating the proceedings." *Id.* at 993. On the contrary, "the imposition of the sentence is left to the *judge or jury* after careful consideration of the aggravating and mitigating circumstances surrounding the crime and the individual defendant." *Id.* at 993 n. 5 (emphasis added). Thus, the Seventh Circuit concluded that the prosecutor's discretion under the statute simply did not fall within the category of "sentencing discretion" that has served as the focus of the Supreme Court's concern in this area. *Id.* at 993. In light of this holding, the Court finds that the ability of the prosecution to initiate a death penalty hearing is simply not enough to implicate constitutional protections. Thus, Petitioner's facial attacks on the statute in this regard must be denied.

Likewise, Petitioner's claim that the statute is unconstitutional "because it is applied in an arbitrary, capricious and discriminatory manner" is foreclosed by the Seventh Circuit's holding in *Davis v. Greer,* 13 F.3d 1134, 1144 (7th Cir.1994):

> [W]e consider Davis' assertion that prosecutors in other murder cases did not seek the death penalty and that doing so in this case (and not others) is arbitrary and capricious. Again, *McCleskey [v. Kemp,* 481 U.S. 279, 306–07, 107 S.Ct. 1756, 1774–75, 95 L.Ed.2d 262 (1987) ] is dispositive. The Court considered the same argument there and concluded that the defendant could not prove a constitutional violation by demonstrating that other defendants who might have been similarly situated did not receive the death penalty.

Moreover, the Seventh Circuit in *Williams v. Chrans,* 945 F.2d 926, 936 (7th Cir.1991), *cert. denied,* 505 U.S. 1208, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992) *quoting Silagy,* 905 F.2d at 998, held: "Because the statute pro-vides 'for a certain result based on the balance struck by the jury between the aggravating and mitigating circumstances,' ... the statute [does] not impose the death penalty in an arbitrary or capricious manner."

Petitioner also argues that the statute "is unconstitutional on its face because it fails to limit the nonstatutory aggravating factors which may be considered by the sentencing authority." This argument is precluded by the Seventh Circuit's holding in *Silagy* that the statute limits those nonaggravating factors to only those which are "relevant to the imposition of the death penalty." 905 F.2d at 1000 *quoting* 720 ILCS 5/9–1(c). Thus, the Seventh Circuit found that because the sentencing authority's "discretion is guided in a constitutionally adequate way ... and is not so wholly arbitrary as to offend the Constitution, the eighth amendment cannot and should not demand more." *Id.* at 1000–01 *quoting Barclay v. Florida,* 463 U.S. 939, 951–52, 103 S.Ct. 3418, 3425–26, 77 L.Ed.2d 1134 (1983).

■ Next, Petitioner argues that the statute "is unconstitutional on its face because it fails to require written findings with regard to nonstatutory aggravating factors that would allow meaningful review and ensure that improper factors were not considered at sentencing." Although it appears that the Seventh Circuit has not addressed this exact issue, the Court finds that it is without merit. Because the Seventh Circuit has found that the statute imposes sufficient constraints on the sentencing authority's consideration of nonstatutory aggravating factors, *id.,* written findings by the jury are not constitutionally required in order to determine whether the death penalty was imposed in an arbitrary or capricious manner. Moreover, trial judges are presumed to know the law and to apply it in making their decisions. *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *Miller,* 800 F.2d at 136. *See also Gacy v. Welborn,* 994 F.2d 305, 313 (7th Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 269, 126 L.Ed.2d 220 (1993) ("[C]ourts invoke a 'presumption' that jurors understand and follow their instructions."). In the face of such a presumption,

there is no constitutional requirement that written findings be made.

Petitioner also maintains that the statute "is unconstitutional because it shifts to the defendant the burden of proving that a sentence other than death is appropriate or at least it is unclear who bears the burden of proof." This argument is precluded by the Seventh Circuit's holding in *Silagy:*

> [W]e agree with the Illinois Supreme Court that where a defendant attempts to persuade the jury that the death penalty is inappropriate in his case, "a burden of persuasion is placed on the defendant by the sentencing statute...." However, we also agree with the Illinois Supreme Court that the imposition of such a burden of persuasion on a defendant "is constitutional because at this point in the hearing the prosecution has already proven beyond a reasonable doubt that a statutory aggravating factor exists making the defendant eligible for the death penalty, and the jury is now weighing aggravating and mitigating factors presented by both the State and defendant." As the Illinois Supreme Court noted, this kind of capital sentencing procedure which specifies a class of murderers who are eligible for the death penalty and provides for consideration of mitigating factors unique to the offense and offender has been approved by the Supreme Court in *Jurek v. Texas,* 428 U.S. 262 [96 S.Ct. 2950, 49 L.Ed.2d 929] (1976); *see also Walton v. Arizona,* [497 U.S. 639], 110 S.Ct. 3047 [111 L.Ed.2d 511] (1990) ("So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency.").

*Id.* at 998–99 (internal citations omitted). *See also Davis,* 13 F.3d at 1143.

Petitioner further contends that the statute "unconstitutionally fails to require a de-

termination that death is the appropriate penalty." First, the Court notes that Petitioner has procedurally defaulted this claim by not presenting it to the Illinois Supreme Court on direct or post-conviction review of his death sentence. *See Jones,* 15 F.3d at 675; *Reese,* 926 F.2d at 671.

However, this claim would also be rejected on its merits because of the Seventh Circuit's holding in *Silagy* that "a sentence of death is imposed in Illinois only after the sentencing authority determines that the aggravating circumstances outweigh the mitigating circumstances in the particular crime committed by the particular defendant." 905 F.2d at 1000. Thus, relying upon the U.S. Supreme Court's decision in *Blystone v. Pennsylvania,* 494 U.S. 299, 305, 110 S.Ct. 1078, 1082, 108 L.Ed.2d 255 (1990), the Seventh Circuit found that the Illinois Death Penalty Statute *does* require "an individualized determination of the appropriateness of a death sentence" and is constitutional. *Silagy,* 905 F.2d at 999–1000. *See also Chrans,* 945 F.2d at 935–36 (relying upon *Silagy* and *Blystone* to arrive at the same conclusion).

Petitioner's next ground is that the statute is unconstitutional because it "fails to provide adequate notice that the State will seek the death penalty." Once again, this claim has been procedurally defaulted because it was not presented to the state courts. Moreover, the merits of this claim were rejected by the Seventh Circuit in *Silagy* which held that neither the Sixth nor Fourteenth Amendment requires pretrial notice to a defendant that the State will be seeking the death penalty. 905 F.2d at 994–97.

Petitioner also asserts that "the determination by a majority of the Illinois Supreme Court that the Death Penalty Statute is unconstitutional renders the statute and Hall's execution unconstitutional." This claim is likewise procedurally defaulted for failure to present it to the state courts. The merits of this claim have also been rejected by the district court in *Albanese* which reasoned that two of the Illinois Supreme Court Justices who comprise this supposed "majority"

**1446**

later filed special concurrences clarifying that they no longer adhere to that view. 823 F.Supp. at 559. *See People v. Albanese,* 104 Ill.2d 504, 85 Ill.Dec. 441, 458–65, 473 N.E.2d 1246, 1263–70 (1984), *cert. denied,* 471 U.S. 1044, 105 S.Ct. 2061, 85 L.Ed.2d 335 (1985). The Court adopts the same reasoning here.

Lastly, Petitioner asserts that "the cumulative effect of its defects renders the Illinois Death Penalty Statute unconstitutional." In addition to this claim being procedurally defaulted, the Court agrees with the Illinois Supreme Court's holding in *People v. Ramey,* 151 Ill.2d 498, 177 Ill.Dec. 449, 476, 603 N.E.2d 519, 546 (1992), *cert. denied,* 508 U.S. 941, 113 S.Ct. 2419, 124 L.Ed.2d 641 (1993):

> While this court is cognizant of that old adage that the whole is greater than the sum of its parts, we fail to see how such an adage could be of assistance in such a case as this. If all of the individual aspects are constitutional, we stand by the conclusion that the whole is also constitutional.

*See also Smith v. Cook County,* 74 F.3d 829, 833 (7th Cir.1996) ("Adding together a string of nothings still yields nothing."). Thus, the Court finds that all of Petitioner's attacks on the Illinois Death Penalty Statute are without merit.

### CONCLUSION

IT IS THEREFORE ORDERED that Petitioner's Amended Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 is **DENIED.** The Clerk is ordered to **TERMINATE** this case.